**MISSOURI PACIFIC RAILROAD COMPANY, Petitioner,**

v.

**The UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Elcor Corporation, Intervenor-Respondent.**

No. 79–1256.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1980.

Decided March 17, 1980.

Rehearing and Rehearing En Banc Denied June 17, 1980.

John P. Legendre, Dallas, Tex., and Robert Lewis Thompson, App. Section, Antitrust Div., Dept. of Justice, Washington, D. C., for petitioner; Mark M. Hennelly, St. Louis, Mo., William R. McDowell, Dallas, Tex., Robert H. Stahlheber, Joseph J. Gazzoli, St. Louis, Mo., John P. Legendre, Dallas, Tex., on brief.

Richard A. Allen, Gen. Counsel, Henri F. Rush, (argued) Associate Gen. Counsel, I.C.C., Ellen K. Schall, Attys., Washington, D. C., on brief for respondent.

John R. Feather, (argued) Johnston & Feather, Dallas, Tex., Bruce E. Turner and Lawrence G. Boyd, Dallas, Tex., on brief for intervenor.

John H. Shenefield, Asst. Atty. Gen., John J. Powers, III and Robert Lewis Thompson, Antitrust Div., Dept. of Justice, Washington, D. C., on brief for respondent, United States.

Before ROSS and HENLEY, Circuit Judges, and PORTER, District Judge.*

ROSS, Circuit Judge.

Missouri Pacific Railroad Company (MoPac) appeals a ruling of the Interstate Commerce Commission denying MoPac's request to abandon a 27.2 mile spur line in a remote area of western Texas.

The spur line in question was built in 1968 at a cost of over 3.5 million dollars. The line was constructed for the sole purpose of providing service to the Elcor Corporation's "Rock House" plant, which was designed to recover sulphur from gypsum. Elcor shared in the expense of the construction of the line. The Rock House plant closed shortly after opening, however, and only 48 carloads of sulphur were ever shipped on the line, although Elcor also shipped some gypsum rock from the plant. In 1975, 94 carloads were shipped on the line and only 106 carloads were shipped in

* The Honorable DONALD J. PORTER, United States District Judge for the District of South Dakota, sitting by designation.

1976, consisting in part of dismantled plant machinery. No shipments were made in the first five months of 1977.

On July 12, 1975, MoPac applied to the ICC for authority to abandon the spur line. On November 4, 1977, a staff Review Board of the Commission denied the application. The Board found that a small profit of $6,697 in 1976 and the generally good financial condition of MoPac outweighed the fact that traffic on the line was light and that MoPac could have achieved a greater return on its investment if the line were abandoned.

MoPac appealed the Board's order, challenging both the Board's reliance on "book value" in computing the profitability of the line, and the Board's failure to consider the "opportunity costs" involved in continuing service on the line. On April 13, 1978, the Commission's Division I reversed the Board's decision, and found that even though the line had shown "marginal profitability," abandonment "would cause little inconvenience to the sole shipper." Division I also noted that MoPac "incurs a substantial opportunity cost by keeping valuable 112-pound rail tied up in a marginal operation." In conclusion, Division I indicated "that applicant's inability to use this rail on other of its lines constitutes a substantial burden on interstate commerce because more efficient movement of other traffic is being sacrificed to accommodate the slight needs of one shipper."

Elcor Corporation sought administrative review of Division I's decision by the Commission and on February 16, 1979, the decision was reversed, 3–2. The Commission found that although "there is nothing to foreclose us from using opportunity costs as one of the factors in making the determination that the public convenience and necessity permits abandonment," there "is an absence of case law indicating how and when this criterion should be used." The Commission found that opportunity costs could be considered in further proceedings but stated that "it would not be proper to consider opportunity costs" in the current proceedings because the parties had not been given sufficient notice. The Commission then indicated that formal notice of a proposed policy statement on "opportunity costs" would be published, but until adoption of such a statement, factors which the Commission identified as "traditional" would be relied upon in abandonment decisions.

The Commission identified the "traditional" factors as "unprofitability, quality of track condition and needed rehabilitation." It was noted by the Commission, however, that abandonment of profitable lines had been allowed based on findings "that future operations would evidently be an undue financial burden on the railroad." But since the majority determined that "substantial future expenditures" for maintenance and rehabilitation were unlikely in the current situation, the abandonment was denied.

The Commission's policy statement on opportunity costs was served on January 10, 1980. *See Abandonment of Railroad Lines—Use of Opportunity Costs*, Ex Parte No. 274 (Sub-No. 3), 360 I.C.C. 571, 577 (1980). The Commission there concluded that opportunity costs must be considered by the ICC in its balancing of factors in abandonment proceedings:

> After examining the public comments we find that opportunity costs must be a factor used in determining whether the public convenience and necessity permits abandonment. This finding reflects our belief that opportunity costs are a real, and, in some cases, very significant factor in determining whether the line at issue is imposing a burden on interstate commerce. We, therefore, advise carriers that in all future abandonment cases they are welcome to offer evidence of their opportunity costs. Such evidence may include the costs incurred in keeping assets tied up in less profitable operations as opposed to more profitable uses elsewhere, including nonrail uses.

Although it is clear from this quotation that opportunity costs are to be considered by the Commission in abandonment proceedings, the new policy is clearly limited to future abandonment cases.

In this appeal, MoPac challenges the Commission's failure to consider the opportunity costs involved in continuing the operation of the spur line, and argues that the case law which preceded the Commission's policy statement provided ample guidance for the proper use of such information. MoPac also challenges the Commission's finding that the line was profitable—a finding which involved computations based on the book value of the railroad's equipment, rather than its replacement value. In addition, several procedural errors in the Commission's decision are alleged by MoPac.

## OPPORTUNITY COSTS

We turn our attention first to the issue of whether the Commission erred in refusing to consider opportunity costs in denying MoPac's application for abandonment. The evidence before us on appeal establishes that the 27.2 mile spur line was constructed with expensive welded rail, is still in good condition, and will require little maintenance in the immediate future. Given the benefit of computations based on the book value of the equipment tied up in operating the line, the Commission determined that the line was operated at a marginal profit. However, MoPac and the United States, a respondent in this action, argue that the Commission was obligated to look beyond the traditional factors of profitability, maintenance and rehabilitation. And they argue persuasively that the impact of opportunity costs on interstate commerce should have been taken into consideration in this abandonment proceeding. We agree.

The test which must be applied in abandonment cases was set forth by the Supreme Court in *Colorado v. United States*, 271 U.S. 153, 168–69, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1966), and it focuses on whether the abandonment is "consistent with public necessity and convenience." Several factors must be balanced in making such a determination, however, and adequate earnings for a railroad is one which is specifically mentioned by the Supreme Court:

The sole test prescribed is that abandonment be consistent with public necessity and convenience. * * * The benefit to one of the abandonment must be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce.

* * * * * *

Whatever the precise nature of these conflicting needs, the determination is made upon *a balancing of the respective interests—the effort being to decide what fairness to all concerned demands.* In that balancing, the fact of demonstrated prejudice to interstate commerce and *the absence of earnings adequate to afford reasonable compensation are, of course, relevant* and may often be controlling. But the Act does not make issuance of the certificate dependent upon a specific finding to that effect.

(Emphasis supplied.)

In other cases courts have focused on the adequacy of the earnings of a railroad seeking abandonment of a particular line in light of the railroad's overall financial condition and in light of the impact of abandonment on interstate commerce. These cases indicate that the opportunity cost involved in tying up expensive rail and other equipment is a factor which properly falls within the Commission's weighing of "prejudice to interstate commerce and the absence of earnings adequate to afford reasonable compensation * * *." *Colorado v. United States, supra,* 271 U.S. at 169, 46 S.Ct. at 456.

In *Commonwealth of Pennsylvania v. United States,* 361 F.Supp. 208, 219 (M.D. Pa.), *aff'd,* 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973), a three judge panel reviewed the authority of the ICC to promulgate regulations designed to expedite abandonment proceedings. The court upheld the regulations, and noted that they did not interfere with the Commission's traditional obligation to balance the relative weight of

many factors in determining whether or not to grant an abandonment. In addition, the court suggested that the Commission should be free to look beyond the profitability of the particular line in question and to consider the impact of the continued operation of that line on both the railroad's overall financial condition and on interstate commerce:

> Although it is true a minimally profitable line may impose but a slight burden on an overall railroad, even that slight burden may outweigh the local interest in maintenance of the line. The burden of a minimally profitable line exists because of the nature of the regulated railroad industry. Until a certificate of abandonment is granted, a railroad is required to provide services on its tracks. To provide these services, expenditures will be required to maintain the line in operating condition. *Expenditures used on this line will not be available for maintenance of other more profitable lines.* It is thus possible for a railroad, limited in its ability to finance track rehabilitation and improvements, to be hindered in its provision of more essential service on other lines by the need to maintain minimally profitable lines. A burden on other commerce may be present, therefore, in maintaining even a profitable line. It is therefore unreasonable for the plaintiffs to assume the I.C.C. must always turn down applications for abandonment of profitable lines.

(Emphasis supplied.)

In *State of Maine Department of Transportation v. Interstate Commerce Commission,* 587 F.2d 541, 543–44 (1st Cir. 1978), the railroad's overall financial health was a factor which was weighed in considering "whether the expenses required for continued service on the line sought to be abandoned can be justified 'in terms of the reasonably predictable revenues.' *Purcell v. United States,* 315 U.S. 381, 385, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942)." The court stated that in an abandonment proceeding, the "Commission was entitled * * * to weigh the probable effect of abandonment on community needs and the Railroad's own

financial health." And while not specifically labeling the financial concerns as "opportunity costs," the court did state that in weighing all of the relevant factors, the Commission "could conclude that abandonment would bring about offsetting benefits to the financially-pressed Railroad, *including the ability to utilize the salvageable rails elsewhere on its lines." Id.* (Emphasis supplied.) This appears to us to be a fairly clear indication of how the Commission should have dealt with the opportunity costs in the present case.

We also feel that a consideration of opportunity costs in abandonment cases is in line with some of the Commission's own decisions, which have emphasized the need to consider the overall savings involved in the abandonment of even profitable branches. As the Commission stated in *St. Louis Southwestern Abandonment,* 290 I.C.C. 53, 73 (1953):

> While the portion of the Sherman branch proposed to be abandoned is part of an existing profitable operation, its continued operation, in effect, will result in losses because the applicant thereby will be precluded from realizing substantial economies. * * * "In these times of increased costs of maintenance *and operation* it is just as important for railroad managements to effect economies as it is to eliminate losses." (Quoting from *Chicago & N. Y. Ry. Co. Abandonment,* 282 I.C.C. 802.)

(Emphasis supplied.) Moreover, the Commission has also been concerned with "the needs of the public using the entire facilities of [a railroad]" when the railroad is in poor financial condition. *New York, New Haven and Hartford Railroad Abandonment,* 324 I.C.C. 396, 403–04 (1965). And the Commission has noted that "the benefits to be gained by [the railroad] through savings and salvage upon its abandonment will be of considerable importance in preserving more essential rail transportation * * * ." *Id.*

█ Admittedly, the present case involves a rather novel factual situation in

that the spur line is new and will require little maintenance or repair. We do not question or disagree with the Commission's factual conclusions in this respect. However, we feel that maintenance, repair and profitability of a particular line are not the only factors which should be balanced in abandonment proceedings. And although the cases and decisions cited in this opinion do not specifically refer to the use of "opportunity costs," these authorities support our conclusion that the economic benefits available to a railroad upon abandonment have frequently been cited as a factor for the Commission to consider in abandonment proceedings. We agree with the First Circuit Court of Appeals that:

> The financial condition of railroads is of central concern to the Commission, because it directly impacts upon their ability to meet their federal duty to provide rail service in the public interest. Thus, in deciding whether or not to authorize an abandonment, the Commission properly considers the financial consequences to the railroad of abandonment *vel non. See Colorado v. United States,* 271 U.S. at 162–63, 46 S.Ct. 452. The salvage of rails and other materials from an abandoned line, either for use on operating lines or for sale, can provide a significant economic benefit to a railroad.

*In Re Boston and Maine Corp.,* 596 F.2d 2, 6 (1st Cir. 1979).

In light of the foregoing, we feel that the Commission erred in disregarding MoPac's evidence concerning the opportunity costs involved in maintaining service on the spur line. Furthermore, we believe that the cases cited in this opinion and MoPac's introduction of evidence concerning opportunity costs should have put the parties on notice that this factor could have been considered by the Commission. We therefore remand this case to the Commission for a consideration of the opportunity costs involved in the continued use of the spur line in question in accordance with the Commission's new policy statement.

## COMPUTATION OF COSTS

We now turn to the question of whether the computation of the avoidable costs of the spur line indicates that the line was, in fact, profitable. The avoidable costs in this case were determined with regard to the book value of the equipment tied up in the line. Through the use of this method, the Commission determined that the line was "marginally profitable." If the total had been computed through the use of the replacement cost of the equipment, the line obviously would have shown a loss.

We are guided in our consideration of this issue by a recent case from the United States Court of Appeals for the Seventh Circuit. In *Chicago and Northwestern Transportation Co. v. United States,* 582 F.2d 1043, 1049–50 (7th Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 641, 58 L.Ed.2d 698 (1978), the court was called upon to interpret portions of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4-R Act) to determine whether certain regulations adopted by the Commission pertaining to avoidable costs in abandonment proceedings were in line with the language of the statute. Among the challenged regulations was one which prescribed the use of book value in determining the adequacy of a subsidization offer made in the course of an abandonment proceeding. The court there recognized that a computation of avoidable cost is one step in determining whether the subsidization offer is adequate: "The railroads' second challenge to the regulations concerns the standards for determining avoidable cost and reasonable return on line for purposes of the commission's determination * * * of whether the offered financial assistance is adequate." And the court specifically focused on the issue of whether the 4–R Act mandates the use of replacement value in estimating the avoidable cost in such proceedings. After carefully analyzing the language of the statute and examining the legislative history of the 4-R Act, the court concluded that:

> The 4-R Act, however, contained its own definition of avoidable cost: "all expenses which would be incurred by a carrier in providing a service which would

not be incurred" if the line were not abandoned or the service not discontinued, including "all cash outflows which are incurred" absent the abandonment or discontinuance, which in turn includes, *inter alia*, "the current cost of freight cars, locomotives and other equipment." Section 1a(11)(a).

Relying heavily on the word "incurred," the Commission argues that "current cost" means the portion of historical cost allocable during the subsidy year in question to the branch line or service that is the subject of the application. The railroads, of course, rely on the literal meaning of "current cost," as well as the context and legislative history. We think the railroads have the better of the argument. The natural meaning of the words used, "the current cost" of equipment "which would be incurred . . . in providing a service" but "would not be incurred" if the service were not provided, seems to us to be the actual present dollar saving that would result from discontinuance or abandonment.

*Id.*

■ We agree with the position taken by the Seventh Circuit Court of Appeals, and we feel that the principles enunciated in its opinion in *Chicago and Northwestern Transportation Co. v. United States, supra,* 582 F.2d at 1050, are applicable to the present case. Therefore, on remand, further consideration should be given the abandonment request in light of the Commission's erroneous reliance on book value, rather than replacement value, in the computation of avoidable costs.

We have also reviewed the procedural errors alleged by MoPac, and find them to be without merit. Since we are remanding this case for a consideration of the substantive legal questions, however, we feel that a discussion of the procedural issues is unnecessary.