656 F.2d 251
 INTERNATIONAL MINERALS & CHEMICAL CORPORATION, United
Transportation Union, Proko Industries, Inc., and
Luellin Brothers, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Norfolk and Western Railway Company, Intervening-Respondent.
 Nos. 80-2096, 80-2097.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 15, 1981.
Decided Aug. 3, 1981.
Rehearing Denied Oct. 5, 1981.
 
 Thomas F. McFarland, Jr., Belnap, McCarthy, Spencer, Sweeny & Harkaway, Chicago, Ill., Gordon P. MacDougall, Washington, D.C., for petitioners.
 Kathleen V. Gunning, Interstate Commerce Commission, Kenneth P. Kolson, Dept. of Justice, Antitrust Div., Washington, D.C., for respondents.
 Angelica D. Lloyd, Roanoke, Va., for intervening-respondent.
 Before CUMMINGS and WOOD, Circuit Judges, and JAMESON, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This case is another in the process accompanying the contraction of this country's rail service. Through a petition for review in these consolidated cases, local shippers and a labor union challenge the Interstate Commerce Commission's ("ICC's") decisions to approve the abandonment by Norfolk and Western Railway Company ("N&W") of two separate rail branches in Indiana. We grant the petitions for review, and remand to the ICC for further consideration of portions of its order.
 
 I. Proceedings Before the ICC
 
 2
 In December 1977, N&W filed with the ICC applications to abandon two branches of its rail network. One application sought approval to abandon a 22.21 mile stretch of track referred to as the Rushville branch. The other application sought approval to abandon a 23.5 mile rail line on the nearby Connersville branch. The cases were consolidated for ICC consideration.
 
 
 3
 A hearing on the proposed abandonments was held before an ICC administrative law judge. Only one shipper who used the Rushville branch, International Minerals & Chemical Corporation ("INC"), appeared at the hearing to protest the proposed abandonment of that branch.[1] Several shippers who used the Connersville branch appeared at the hearing, although one, Ford Aerospace & Communications, indicated that its concern over the proceeding extended only so far as necessary to assure continued service to it by ConRail, which used a segment of N&W's Connersville branch pursuant to a trackage agreement.[2] Ford is not a party to this appeal. The United Transportation Union ("UTU") and the Brotherhood of Locomotive Engineers opposed both applications. UTU is the only union that is a party before this court.
 
 
 4
 N&W produced evidence to show that the branches were presently unprofitable and in need of such extensive repair and future maintenance in order to continue safe operation that the branches would never become profitable. The administrative law judge concluded that the Rushville branch was profitable and would continue to be so with normal maintenance; that the shippers on the lines would be placed at a competitive disadvantage if N&W abandoned the branches; and that N&W deliberately had downgraded its track in order to make the case for abandonment. The Connersville branch, the administrative law judge held, was profitable and would be so with normal maintenance; served the public need; and would experience increased traffic. Hence, the administrative law judge denied N&W's requests for abandonments. The full ICC reversed the administrative law judge's decision. Norfolk and Western Railway Company Abandonment, 363 I.C.C. 115 (1980).
 
 
 5
 Since N&W wants to abandon these branches because of their unprofitability, in order to prove the economic necessity for abandonment the railroad had to show that it would actually save its costs of running the lines if they were shut down. The administrative law judge refused to consider certain labor costs in determining the lines' profitability since in his view those expenses would exist regardless of the lines' operation. By excluding from his calculations the cost to N&W of labor expenses, the administrative law judge found that both branches generated enough profit to maintain the line at minimum operating standards. The ICC disagreed, and on review acknowledged employee wages as an expense that could be saved upon abandonment, making the wages an "avoidable cost" in public transportation jargon. The ICC's calculation reduced the branches' profit margins to a level that failed to produce a reasonable rate of return to N&W.
 
 
 6
 At the initial hearing, the branches' profitability figures were enhanced by the administrative law judge's conclusion that normalized maintenance on the line could be less than that stated by N&W. The ICC agreed, but held that when coupled with even a reduced figure for normalized maintenance, its inclusion of labor expenses as avoidable costs resulted in a narrow profit for the Rushville branch, and a loss for the Connersville branch.
 
 
 7
 The ICC disagreed with the administrative law judge's conclusion that the track and other physical plant on the Rushville branch required no rehabilitation because it presently met minimum safety standards. The ICC went on to state that the decline in traffic on the branch undercut any justification for substantial rehabilitation expenditures. And assuming that inflation would raise the true cost of future normalized maintenance, the ICC found that the line would become unprofitable.
 
 
 8
 The ICC agreed with the administrative law judge's finding that the Connersville branch required substantial rehabilitation. Applying the lower normalized maintenance figure to the year 1977, when N&W deferred most maintenance on that branch, the ICC found that the line would operate at a substantial loss. The ICC concluded that while the line's traffic had increased due to rising activity at the Ford plant, since ConRail could handle the Ford business even after N&W's abandonment, there was no justification for continuing N&W's operation. To take into account Ford's interests, the ICC conditioned abandonment upon N&W's good faith offer to sell ConRail the portion of its line that the latter carrier currently operated under trackage rights.
 
 
 9
 The ICC found that alternative motor and rail carrier service was available to shippers on both lines. This fortified the ICC's conclusion that the shippers would not be unduly harmed by the abandonments.
 
 
 10
 The administrative law judge had concluded that the branches' financial picture did not justify N&W's downgrading the lines by deferring maintenance. He went on the find that N&W had intentionally and improperly downgraded the branches in order to perfect a case for abandonment. The ICC's contrary view on the lines' profitability led it to accept N&W's decision to defer maintenance and thus avoid "throw(ing) good money after bad without any prospect of obtaining a profit in return." The ICC did not, however, discuss an incident described by the administrative law judge in which N&W, prior to filing its abandonment application, told the Rush Grain Company that it planned to abandon the Rushville branch. This comment induced Rush Grain to shelve its plans to construct at its own expense a rail spur from the Rushville branch to its facilities. The spur would have added as many as 500 carloads per year to the branch's traffic.
 
 
 11
 Thus the ICC permitted the abandonments requested by N&W, and this appeal followed.
 
 
 12
 In considering these challenges to the ICC's action, we bear in mind that the agency's decision must be upheld if it is not arbitrary, capricious or an abuse of discretion. See Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).[3] The ICC's conclusions must exhibit a rational connection between the facts it finds and the decision it makes. Id. at 285, 95 S.Ct. at 441. Our review of those conclusions must be "searching and careful," id., particularly here, where the ICC has rejected the administrative law judge's exhaustive and careful findings. Illinois v. United States, supra, note 3, slip op. at; NLRB v. Interboro Contractors, Inc., 388 F.2d 495 (2d Cir. 1967).
 
 II. Avoidability of Labor Costs
 
 13
 The first issue in this case centers on the question of whether or not the wages paid to railroad employees who presently work on the Rushville and Connersville branches could be saved by N&W if the lines were abandoned. The ICC overturned the administrative law judge's findings and held that the wages are avoidable costs. Because the labor expenses are so large, this materially shifted the balance away from a finding of profitability on the two lines.
 
 
 14
 The repair and maintenance crews on the two branches spend a portion of their time working on other lines. Since the employees' wages are paid for both work done on these branches and on other lines, the petitioners say, the employees still will have to be retained, and there will be no saving to N&W. Thus, petitioners claim, the wages that presently are paid to these employees on the branch are jointly shared with other of N&W's operations, and will not be reduced if the branches are abandoned. They contend that this case represents a "true joint cost" situation.
 
 
 15
 The ICC rested its conclusion about the avoidability of labor costs on one of its own cases, Illinois Central Gulf Company Railroad Abandonment, 363 I.C.C. 93 (1980), rev'd and remanded on review sub nom., City of Cherokee v. I.C.C., 641 F.2d 1220 (8th Cir.), cert. filed, 49 U.S.L.W. 3969, No. 80-2122 (June 15, 1981). Petitioners contend that the case does not support the ICC's conclusions since it concerns circumstances that do not implicate joint costs. As framed by the petitioners, then, our consideration of this issue turns on the existence vel non of a joint cost situation in the branches at issue.
 
 
 16
 We first note that while a true joint cost may almost always be unavoidable, not all unavoidable costs are joint ones. The ICC defines joint cost to cover a particularized subset of unavoidable costs. According to the ICC definition, a true joint cost exists when two services run over the same line, and only one of the services is eliminated. The repair work done on the line, for example, must usually be maintained at the same level for the remaining service, hence effecting no savings for the railroad. The repair crew's wages, then, are joint costs. See Illinois Central Gulf, 363 I.C.C. at 99 n.6. Since in our case there are no other services travelling this line (with one exception to be discussed later in this section), no joint cost situation is involved.
 
 
 17
 N&W proffered uncontradicted evidence that the employees worked a specific percentage of time on each branch. The evidence also showed that N&W's local management has the flexibility to assign and re-assign its employees as it wishes, although specific placements in the event of abandonment had not yet been considered at the time the evidence was entered.
 
 
 18
 This evidence demonstrates the ICC reasonably found that this case does not involve a true joint cost situation. No one disputes that the wages for work on each line can be separately apportioned to that line. It is clear which portion of the wages are paid for the work done on each line. Should operations over the branches terminate, the wages that would have to be paid to employees for their work on those branches need no longer be paid. The employees' time is freed for productive work elsewhere in the N&W network: work that otherwise might require the hiring of new personnel or the payment of overtime or premium wages. Thus, contrary to the petitioners' assertions, the circumstances here are far different from those implicated by the ICC's definition of a true joint cost situation.
 
 
 19
 The questions then become whether the ICC properly relied on the Illinois Central Gulf case, and whether the labor costs are avoidable even if not joint. We conclude that the ICC properly relied on the case, and acted within its discretion in concluding the labor costs are avoidable.
 
 
 20
 In Illinois Central Gulf the ICC held that a collective bargaining agreement guaranteeing wages to employees on a certain line regardless of whether or not the line was abandoned, did not preclude a railroad designating the labor expenses as an avoidable cost when an abandonment is sought. Language in the ICC's opinion suggested that the only un avoidable costs were those which are joint. The majority of the panel in Cherokee opted for a more flexible reading of the statutory definition regarding avoidable costs, and concluded that where wages must be paid pursuant to a collective bargaining agreement regardless of operations over the line, the labor expenses cannot be considered avoidable. The majority did not state that the ICC's definition of a joint cost was incorrect in any manner. Rather, on this issue, the majority in Cherokee held only that avoidable costs do not include employee wages guaranteed under a labor agreement such as the one involved in that case. Since, as the petitioners recognize, there is in the present case no issue about a restrictive collective bargaining agreement, the majority's discussion in Cherokee does not apply.
 
 
 21
 Nor does Judge Adams's dissenting opinion in Cherokee alter our conclusions in this case. He simply disagreed with the majority's view that the ICC had equated avoidable costs with joint costs. Like the Cherokee majority, Judge Adams had no complaint with the ICC's definition of joint cost.
 
 
 22
 That the ICC relied on a case subsequently overturned on review does not mandate a reversal here. The general principles underlying the Illinois Central Gulf decision remain intact; it was only the application of those principles to a certain narrow fact situation that caused the controversy in Cherokee. Thus, there remains a venerable line of cases in which the ICC has deemed labor expenses avoidable costs where the circumstances indicate employees will be shifted to other productive service upon abandonment.[4] The majority in Cherokee viewed the labor agreement involved in that case as pointing so clearly to the unavoidability of wages that there was no room for the ICC to come to the contrary conclusion. Since the present case does not involve such a labor agreement or any other similar evidence that could serve to limit the ICC's discretion, and does not involve a true joint cost situation, the principles in Illinois Central Gulf on which the ICC relied support its decision here.
 
 
 23
 The decision on whether or not employee transfers in fact will result in savings to the railroad is one for the ICC, not this court. We see no reason to disturb the ICC's conclusions in this case, at least as regards most of the line.
 
 
 24
 There is, however, one remaining issue that requires a remand to the ICC. ConRail operates pursuant to trackage rights over approximately a six-mile stretch of the Connersville branch. The ICC argues in connection with another issue in this case, see Section VII, infra, that ConRail will be allowed to use that stretch regardless of N&W's abandonment, implying that N&W is contractually bound to maintain the track. The record before us does not indicate whether the wages attributable to that portion of the track were included in the computation of avoidable labor costs. Because the extent of avoidable labor costs is the linchpin of much of the cost-accounting in this case, it is advisable that we remand for the ICC's determination of the amount of wages attributable to potential future upkeep, and a decision on whether this readjustment (if one need be made) affects the decision on the propriety of abandoning the Connersville branch.
 
 
 25
 III. Inclusion of Normalized Maintenance Figures
 
 
 26
 The petitioners object to the ICC's use of a calculation for normalized maintenance in determining the past and future profitability of the branches at issue here. Normalized maintenance is the amount needed for economic and efficient operation of the branches over the long term. See Illinois v. United States, slip op. at 18 n.5 os. 78-1762, 78-2020 and 78-2043, (7th Cir. Jan. 20, 1981). In railroad accounting it is contrasted with actual maintenance, which is the minimum expenditure necessary for safe short term operation. The petitioners contend that by using a larger normalized maintenance figure to determine true present profitability, the ICC artificially inflated expenses to make the branches appear unprofitable. We cannot agree.
 
 
 27
 The petitioners' argument is grounded on several incorrect assumptions. First, contrary to petitioners' characterization, the ICC did not use the figures to determine profitability as an initial matter. The figures instead were used only after the ICC determined that even deducting labor costs, and considering actual rather than normalized maintenance expenditures, the branches operated at a profit. The ICC then applied its normalized maintenance calculation to the actual maintenance figures for 1976 and 1977, when N&W admittedly deferred maintenance. This gave a more accurate picture of what it would have cost N&W to run the branches those years, but only after the ICC acknowledged that as computed on actual expenditures, the lines earned a profit. This was in keeping with the ICC's practice as described in New York, New Haven and Hartford Railroad Company Abandonment, 324 I.C.C. 345, 351 (1965): "Costs for normalized maintenance when compared to actual maintenance expenditures are indicative of deferred maintenance on any given branch and are to be given consideration in determining whether or not the public convenience and necessity permit abandonment of the line."
 
 
 28
 The petitioners have not suggested why the ICC should calculate the true extent of deferred maintenance without taking the further step of readjusting for a more accurate picture of past profitability. An important aspect of the ICC's determination is whether the branches were profitable. If the deferral of maintenance skewed profitability figures for certain years, it is important that the ICC know that fact when considering an abandonment application. The calculation need not be an abstract accounting exercise. See Chicago and Northwestern Transportation Company Abandonment, 348 I.C.C. 708 (1976) (comparison of projected normalized maintenance figures to actual expenditures in order to determine whether in absence of deferred maintenance railroad would have incurred loss).
 
 
 29
 The second incorrect assumption on which the petitioners base their argument is the implication that the ICC's calculations on normalized maintenance prejudiced them. The petitioners claim that the ICC improperly used the actual maintenance figures of 1975 as its standard for the normalized maintenance applicable in 1976 and 1977. This argument ignores the fact that the petitioners themselves urged a normalized maintenance figure that was twice the amount the ICC used in its calculation. There would, on these facts, appear to be no basis on which the petitioners can now complain that the ICC used an amount that over-inflated the expense side of its calculations. If anything, the ICC was overly generous in the other direction.
 
 
 30
 Moreover, the petitioners drew their figures based on actual maintenance expenditures on those branches in 1975. That fact likewise undercuts their complaint that the ICC erred in failing to average at least three years' actual maintenance figures in order to derive its own normalized maintenance level. The record indicates that before the ICC handed down its decision, the petitioners expressed no dissatisfaction with the administrative law judge's use of the same single year to make his calculation. Given the absence of reliable data on actual maintenance levels for any year except 1975, the ICC and the administrative law judge properly used that single year as a yardstick. Cf. Northern Pacific Railway Company Abandonment, 342 I.C.C. 1 (1970) (used three years' figures where those were available). The ICC cannot be faulted here for taking the only solid figure it had as a basis to compute normalized maintenance, especially where the figure is less than that proposed by the petitioners.[5]
 
 IV. Rehabilitation Costs
 
 31
 The ICC concluded that both lines are in need of rehabilitation, and that this added expenditure would make continued operation of the branches unfeasible. Rehabilitation is a one-time activity, so it is considered as a short-term expenditure, unlike the recurring cost of normalized maintenance. An ICC regulation, promulgated for use in computing subsidies, specifies that rehabilitation costs are not be to included in calculations unless the line does not presently operate at minimum safety standards. 49 C.F.R. 1121.42(m). IMC challenges the use of rehabilitation figures in this case because the Rushville branch presently operates at the minimum safety standard.[6]
 
 
 32
 Evidence before the administrative law judge indicated that the eighty-year-old, lightweight rail in use on the Rushville branch required extensive work in order to be assured of future operation at minimum safety levels. The evidence suggested that the ties on which the rails rest need to be more closely spaced in order to avoid eventually stressing the rail beyond its yield point.
 
 
 33
 As the petitioners point out, there is an ICC regulation limiting use of rehabilitation costs when a line presently operates at the minimum safety level. That regulation, however, applies to computations for railroad subsidies. A rule limiting the use of rehabilitation costs makes sense in that context since a subsidy involves a commitment of cash in the nature of a short-term expenditure that may be terminated upon short notice.[7] Continuation of the Rushville branch, in contrast, represents a financial commitment for a far longer term, and it is not unreasonable for the ICC to weigh the costs of rehabilitation in determining what the actual expense of maintaining the branch will be. This is in keeping with ICC precedent approving "abandonment applications in such cases where, despite the fact that minimal maintenance for presently 'safe' operations was being performed, a proven need for rehabilitation existed to insure such operations in the future." Baltimore and Ohio Railroad Company, 342 I.C.C. 751, 754 (1973).
 
 
 34
 Moreover, rehabilitation costs need not be figured with exactness. Id. at 755. Even eliminating the necessity for closing the space between ties, estimated rehabilitation costs are extensive in this case, rising well above a quarter million dollars on each branch. The ICC was entitled to take into account the generally large rehabilitation figures reflected in the record as necessary for long term operation at a reasonable level of safety.[8]
 
 V. Computation of Opportunity Cost
 
 35
 The petitioners assert that the ICC improperly considered N&W's opportunity costs as bearing on the public's interest in maintaining rail service over these branches. Here, opportunity costs measure the economic loss N&W experiences by foregoing more profitable use of its resources. See Abandonment of Rail Lines Use of Opportunity Costs, 360 I.C.C. 571 (1980), upheld on petition for review sub nom. Farmland Industries, Inc. v. United States, 642 F.2d 208 (7th Cir. 1981).[9] The petitioners alternatively argue that even if opportunity cost was an appropriate factor for ICC consideration, the ICC used incorrect figures in making its determination.
 
 
 36
 The ICC properly considered opportunity costs in this case. In Missouri Pacific Railroad Company v. United States, 625 F.2d 178 (8th Cir. 1980), the court held that the ICC must consider a railroad's opportunity cost when balancing the public interest in permitting an abandonment. The ICC had disregarded Missouri Pacific's evidence concerning opportunity costs, and the court remanded the case for reconsideration. The court concluded that previous ICC cases presaged such a requirement, giving due notice to the parties that opportunity costs could be considered. 625 F.2d at 182. And the Eighth Circuit concluded that the absence of a regulation governing use of opportunity costs at the time of decision did not limit the requirement that the ICC consider such costs. Id.
 
 
 37
 Like the petitioners in Missouri Pacific, the petitioners here were put on notice by precedent and by N&W's attempt to place opportunity costs into evidence on administrative appeal. The ICC, perhaps taking its cue from the Missouri Pacific case decided two months prior to the ICC's decision in this case, considered N&W's arguments and noted that, including labor expenses as an avoidable cost, the branches failed "by a wide margin" to return a reasonable amount on investment. There was no error in that action.
 
 
 38
 The ICC, however, erred in the figures used to make its computations. The ICC applied figures for salvage value which had been submitted by N&W as an exhibit before the administrative law judge. N&W had later reduced those figures by $100,000 in connection with the Rushville branch, and about $200,000 in connection with the Connersville branch. The change in salvage value would also alter the tax figures taken into account by the ICC as part of its calculation, see note 9, supra; Abandonment of Railroad Lines and Discontinuance of Service, Proposed Rulemaking and Order, 41 Fed.Reg. 31883 (July 30, 1976), and would result in a new calculation figure that indicates a reasonable rate of return. The ICC's decision, then, is arbitrary and capricious since it lacks any basis in the record. See Doe v. Hampton, 566 F.2d 265, 272 n.15 (D.C.Cir.1977).
 
 
 39
 The ICC and N&W have made little attempt before this court to rebut the charge of miscalculation, but hypothesize that it would have made no difference in the final outcome of the case. Alternatively, say the ICC and N&W, certain figures that were left out of the initial calculation would substantially replace the excess amounts contained in its computations.
 
 
 40
 We cannot tell from the record before us whether a correction of the miscalculation would have made a difference in the ICC's ultimate disposition of this case, even when hefty rehabilitation and normalized maintenance costs are entered into the calculus. Nor have the ICC or N&W directed our attention to any authority permitting us to calculate and determine on our own the effect such a switch in profitability figures could have on the public interest. We must, therefore, remand to the ICC for recalculation of opportunity costs and a determination of the effect such a recalculation would have on the public interest in this abandonment.
 
 VI. Deliberate Downgrading
 
 41
 Those protesting the Rushville branch abandonment assert that N&W's deferral of maintenance represented an improper, deliberate attempt to downgrade the branches in order to perfect a case for abandonment. The ICC concluded that since the line was not, according to the ICC's computations, a profitable operation, N&W properly deferred maintenance in recent years. The ICC found no evidence of specific intent to deliberately downgrade the line.
 
 
 42
 Since the ICC on remand may alter its conclusions about the profitability of the branches and that change could affect its view of the justifications for N& W's deferring maintenance we cannot address with certainty the propriety of the ICC's conclusions. In order to provide some guidance to the ICC, however, we consider it necessary to discuss the ICC's findings as they now stand.
 
 
 43
 We can find no error in the ICC's conclusion on N&W's intent in deferring maintenance, based as it was upon a finding that the Rushville branch was an unprofitable operation. Both sides in this case cite Missouri-Kansas-Texas Railroad Company Abandonment, 338 I.C.C. 728 (1971) in support of their positions.[10] There the ICC set out criteria rail companies should address to demonstrate that a genuine need to economize prompted deferral of maintenance. The petitioners claim that the ICC did not consider these factors when it overturned the administrative law judge's conclusion that N&W exhibited an intent to defer maintenance to perfect its case for abandonment. As evidence of this failure to consider the criteria, the petitioners point particularly to the absence of any mention in the ICC's opinion of the incident in which N&W, prior to filing its abandonment application, told the Rush Grain Company that the railroad anticipated abandoning the branch. This discouraged the Rush Grain Company from building a spur track which would add traffic to the Rushville branch.
 
 
 44
 The ICC properly stated that once it had made its determination that deferring maintenance was financially justified, the governing standard required it to accept N&W's decision to defer maintenance for economic reasons unless the evidence showed "some ulterior motive to downgrade deliberately." The ICC was not required to discuss each factual point brought out by the petitioners, especially since the administrative law judge's contrary finding primarily rested on a conclusion about economic viability, albeit different from that of the ICC. For the administrative law judge, the Rush Grain incident took on significance only because N&W had no financial incentive to abandon the Rushville branch. N&W, in his view, should have been actively encouraging new business on the branch. But N&W's informing a prospective shipper of an action expected to be made by the line takes on a different cast when the branch is thought to be highly unprofitable. While it is true that the ICC is obliged adequately to address the evidence presented by one protesting an abandonment, see Harborlite Corporation v. ICC, 613 F.2d 1088 (D.C.Cir.1979), the requirement cannot be carried beyond any reasonable necessity. Once the reason prompting the administrative law judge to consider the evidence dropped from the case upon a finding of unprofitability, the ICC was under no obligation to discuss the evidence further.
 
 VII. Condition to Abandonment
 
 45
 Those protesting the Connersville branch abandonment challenge the portion of the ICC's decision that conditions abandonment upon N&W's good faith offer to sell to ConRail the stretch over which the latter railroad operates pursuant to a trackage rights agreement. The requirement was placed on N&W in order to protect the interests of the Ford plant, which presently is served by ConRail. The petitioners claim that the condition is pointless since it does not guarantee train service to Ford: if no sale is consummated, the petitioners say, ConRail must stop operations on the line.
 
 
 46
 The petitioners' argument is meritless. Aside from questions of these petitioners' standing to attack that portion of the decision (Ford has not sought review), it is evident that ConRail will retain its trackage rights regardless of abandonment by N&W. On this point the ICC and the administrative law judge were in agreement. The ICC must approve termination of ConRail's present operation, and the ICC's order permits rather than requires N&W's abandonment of this Connersville segment. See Chicago and North Western Railway Company v. Milwaukee, St. Paul and Pacific Railroad Company, 502 F.2d 193 (7th Cir. 1974). The order to attempt a sale protects Ford's interests, and leaves open the possibility that an orderly transfer of the affected segment will obviate the need for the ICC either to approve abandonment by ConRail or to order continued upkeep by N&W. The ICC's order, as it stands, leaves the option in the carriers' hands as an initial matter, subject to further ICC inquiry should the need arise. The decision was rational, and we deny the challenge to it.
 
 VIII. Conclusion
 
 47
 We grant the petition for review. The case is vacated and remanded to the ICC for further proceedings not inconsistent with this opinion. In regard to the Connersville branch, the ICC must determine whether maintenance and repair crew expenses are avoidable labor costs on the portion served by ConRail; whether correct salvage value figures will result in an adequate rate of return for N& W; and, if necessary, whether rehabilitation costs play a role in the decision on this branch. As regards the Rushville branch, the ICC must consider whether or not accurate salvage value figures result in an adequate rate of return for N&W, and if so, whether this requires a reconsideration of the significance of the Rush Grain Company incident and the justification for rehabilitation in light of recent increases in tonnage over the branch.[11]
 
 
 
 *
 The Honorable William J. Jameson, Senior District Judge of the United States District Court for the District of Montana, is sitting by designation
 
 
 [1]
 Another shipper who used the branch, Ralston Purina Company, entered an appearance there to protest abandonment, but took no active part in the proceedings, and is not a party to this petition
 
 
 [2]
 Kinsinger Coal & Feed Sales entered an appearance before the administrative law judge to protest the proposed abandonment, but did not otherwise participate in the proceeding, and is not a party here
 
 
 [3]
 The parties in this case have not argued whether or not the substantial evidence test applies in our consideration of the ICC's decision. We have doubts as to whether that test does apply, since it is unclear that the statute governing railroad abandonments requires a hearing, even if a decision on abandonment is considered an adjudication. Illinois v. United States, slip op. at 8-11 Nos. 78-1762, 78-2020 and 78-2043 (7th Cir. Jan. 20, 1981). The substantial evidence test applies when hearings are statutorily required. The parties have not cited, nor has our research disclosed, an express statutory mandate for a hearing in rail abandonments. See 49 U.S.C. § 10904(c) (1): "An investigation (on abandonment) may include public hearings ...." (Emphasis added.) In the absence of argument on this point, we decline to decide that an adjudication implies a hearing for purposes of applying the substantial evidence test, and do not apply the test in this case. See Illinois v. United States, slip op. at 9
 
 
 [4]
 IMC cites ICC cases to support its arguments that labor costs are not avoidable unless it can be shown that direct savings will result from the abandonment, and will not simply be reallocated to other of the carrier's operations. Upon scrutiny, the cases serve as good examples of the latitude accorded the ICC to reach precisely the opposite result. For example, Erie Lackawanna Railway Company Discontinuance, 336 I.C.C. 206 (1969), concerned discontinuance of passenger service over lines that also carried other train traffic. The case involved the more usual joint cost situation. Yet even there, the ICC deemed avoidable certain employees' wages. In regard to a challenge to the avoidability of wages paid to a yard crew, the ICC commented (without citation to record evidence), that "(u)pon discontinuance, these crews would be available to offset overtime and premium wage expenses elsewhere in the yards." 336 I.C.C. at 232. In the present case N&W has made substantially the same showing by presenting evidence that its local management can flexibly reassign the work crews. Moreover, N&W does not purport entirely to avoid the wages of the affected employees, but only that portion devoted to service on these two branches. The ICC reasonably could infer, as it did in Erie Lackawanna, that direct savings will come from the "offset (to) overtime and premium wage expenses elsewhere."
 The case of New York, New Haven and Hartford Railway Company Discontinuance, 320 I.C.C. 714 (1964), likewise lends no support to the petitioners' position. Once again facing a joint cost situation, the ICC stated generally that an avoidable cost must be one directly attributable to the service unit at issue, and not merely be an expense that may be added to another existing service unit. 320 I.C.C. at 718. It is clear from the context of the case that the other service units to which a purported avoidable cost could not be transferred were those units that travelled the same tracks; e. g., freight service, as opposed to the commuter service that was the subject of the discontinuance. As the Appendix to the case specifies, the ICC recognized as needing no discussion the avoidability of certain crew and repair expenses attributable solely to the commuter service; but the ICC, consistent with our analysis here, excluded as unavoidable maintenance of way expenses for track over which other service units travelled. Moreover, the ICC noted that "(t)he avoidance of costs at (a station beyond the stretch at issue in the case), if in fact the discontinuance would have such an effect, would not come from a reduction in force, but from releasing men for other productive work." 320 I.C.C. at 724. The ICC, then, recognizes that shifting employees from one work location to another pursuant to termination of rail service may effect a savings, even when the terminated service involves a joint cost situation. Accord, Consolidated Rail Corporation Discontinuance, 360 I.C.C. 324 (1979) (where commuter service terminated but freight service continued over same trackage, certain labor costs not proven avoidable in absence of direct evidence of savings).
 
 
 [5]
 The petitioners contend that the ICC's discussion on normalized maintenance is insufficiently clear to allow adequate review by this court. See United States v. Chicago, Milwaukee, St. Paul and Pacific Railroad, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). They point out that the respective N&W and government briefs differ in characterizing the ICC's action, and more particularly that N&W claims the ICC accepted N&W's much higher figures when making its calculation. As the ICC's opinion shows, it did not "accept" any figures as being the accurate ones, but merely noted that even using the lowest figures possible, its result was the same. Our conclusions render the petitioners' contention irrelevant, since we look only to the figures actually used in the ICC's opinion. The petitioners could not be harmed by the ICC's use of maintenance figures that were lower even than those the petitioners sought. A remand in order to clarify the ICC's discussion would be an idle exercise
 
 
 [6]
 The record on appeal does not indicate that those protesting the Connersville branch abandonment had any quarrel with the administrative law judge's conclusion that the branch needed $363,000 of rehabilitation to meet minimum safety standards. The ICC's opinion, however, is somewhat vague on precisely what role rehabilitation costs play in its decision that the Connersville branch should be abandoned as unprofitable. The ICC should address this vagueness during its consideration on remand of this case
 
 
 [7]
 Financially responsible persons, including private individuals or government entities, may subsidize a rail line in order to avoid the line's abandonment or discontinuance. See 49 U.S.C. § 10905(d). The subsidy may be terminated with sixty days notice. 49 U.S.C. § 10905(f)(5)
 
 
 [8]
 IMC in its Reply Brief on this point cites us an unpublished order of this court issued in a case unrelated to the one before us. Rule 35 of this circuit prohibits citation of this court's unpublished orders as precedent, except to support a claim of res judicata or collateral estoppel. This is an important rule of practice, and one to which we expect counsel scrupulously to adhere. In any event, the case cited is clearly distinguishable
 
 
 [9]
 The petitioners point out that the ICC's opinion in the present case misstated the basis of its computation. The ICC said it derived its figures on 9.9% of the branch's salvage value. In fact, the opportunity cost figures were derived on the proper basis of the sum total of salvage value, income tax benefits and working capital for fifteen days. For clarity, the ICC should so explain on remand
 
 
 [10]
 The ICC concluded that there were no prospects for increased traffic over the Rushville branch, and that taken together with the finding of unprofitability, there was no justification for spending large amounts to rehabilitate the line. Although IMC argues that the tonnage has increased over the branch in recent years due to the use of larger railroad cars, we see nothing arbitrary or capricious in the ICC's conclusion that revenues from this traffic did not justify the expenses for rehabilitation. Given a potentially changed profitability picture on remand, however, the ICC will wish to reconsider this question
 As discussed elsewhere, see note 6, supra, the ICC's opinion is somewhat unclear on the role that rehabilitation expenses played in the decision to authorize N&W to abandon the Connersville branch. To the extent that decreased traffic aside from the shipping activity at the Ford plant was used by the ICC in its determination, we can perceive nothing arbitrary or capricious in the ICC's action. The increased Ford traffic was addressed in the portion of the ICC's opinion concerning ConRail's trackage rights, and there was nothing arbitrary or capricious in the ICC's dealing with that component of Connersville branch traffic separately from the minimal number of rail cars otherwise moving on the branch.
 
 
 [11]
 We regret that this matter cannot end with this proceeding. The case as presented to this court has been marked by thorough briefing and argument by each side's respective counsel. The court hopes that the ICC on remand will engage in the same thoroughness of consideration and discussion