775 F.2d 854
 Patrick W. SIMMONS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Illinois Central Gulf Railroad Co., Freeport & El Paso
Railroad Co., People of the State of Illinois and
Illinois Commerce Commission,
Intervening-Respondents.
PEOPLE OF the STATE OF ILLINOIS, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Illinois Central Gulf Railroad Co., Intervening-Respondent.
 Nos. 83-2791, 84-1795.
 United States Court of Appeals,
Seventh Circuit.
 Oct. 22, 1985.
 
 Gordon P. MacDougall, Washington, D.C., James E. Weging, Asst. Atty. Gen., Chicago, Ill., for petitioner.
 Cecelia E. Higgins, Gen. Counsel, I.C.C., Washington, D.C., for respondents.
 John H. Doeringer, ICG, Co., Chicago, Ill., for intervening-respondents.
 Before WOOD and ESCHBACH, Circuit Judges, and CAMPBELL, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 We consider two consolidated petitions, one by Patrick Simmons, the other by the State of Illinois, to set aside and remand two Interstate Commerce Commission ("Commission") decisions concerning a proposed abandonment in Central Illinois by the Illinois Central Gulf Railroad Company ("ICG") of 148.89 miles of track and the proposed, but never consummated sale of major segments of this tract to another railroad, Freeport & El Paso Railroad Company ("F & EP").
 
 
 2
 Petition No. 83-2791, filed by Patrick Simmons October 7, 1983,[1] challenges the ICC's Certificate and Decision of September 15, 1983 authorizing ICG to abandon three segments of its line in central Illinois: an 11.35-mile segment from Heyworth to Normal, an 11.53-mile segment north of Normal (Kerrick) to El Paso on the Amboy District, and a 4.83-mile Bloomington District line. This petition also challenges a decision issued September 21, 1983 authorizing F & EP to acquire the line between Freeport and El Paso, a distance of 121.18 miles, and dismissing ICG's application to abandon that portion of the Amboy District. In all, 148.89 miles of line are involved.
 
 
 3
 Petition No. 84-1795, filed by the State of Illinois on May 1, 1984,[2] challenges the Commission's Certificate and Decision of May 10, 1984, authorizing ICG to abandon the remaining 121.18 miles of line between Freeport and El Paso, and vacating the September 21, 1983 decision approving acquisition by F & EP of the 121.18-mile line. The May 10, 1984 decision also vacated a July 1, 1983 finding that F & EP was financially responsible.[3]
 
 
 4
 The petitions raise three issues: first, whether the Commission acted in excess of statutory authority in reopening a previously dismissed rail abandonment proceeding where the anticipated sale that predicated the first dismissal failed to occur, thus forcing the railroad seeking to abandon to continue service; second, whether the Commission, in originally approving the entire abandonment, acted arbitrarily and capricously; and third, whether the Commission's denial of petitioner's request to reopen the abandonment proceeding was a proper exercise of the Commission's discretion.
 
 Factual Background
 
 5
 In late 1982, while preparing to file its application to abandon the 148.89-mile segment, ICG requested and received permission from the Commission to exclude evidence of bridge traffic revenue, that is, revenue from traffic that, although travelling over the segment sought to be abandoned, does not originate or terminate on it. On June 17, 1983, after investigating the application, the Commission gave public notice that public convenience and necessity justified abandonment. Shortly thereafter, F & EP offered to buy 121 miles of the 148.89-mile segment and the Commission proceeded to find that F & EP was financially responsible within the meaning of 49 U.S.C. Sec. 10905(d).[4]
 
 
 6
 While F & EP and ICG were negotiating the purchase, the Commission proceeded to hear the appeal from its initial decision authorizing abandonment of the entire 148.89 miles. In its appellate decision the Commission accepted ICG's use of replacement cost of equipment in calculating "off-branch" costs.[5] The Commission also noted that ICG had made available to opposing parties sufficient information to enable them to verify cost calculations. Finally, the Commission reaffirmed that the record need not contain the revenues associated with bridge traffic since ICG had not included corresponding bridge traffic costs and it had rerouted its bridge traffic to other lines.
 
 
 7
 After considering avoidable losses (including opportunity costs), the needs of the community and shippers, and available transportation alternatives, the Commission affirmed the abandonment of the 148.89 miles. However, in light of the anticipated purchase of 121.18 miles, the issuing certificate only authorizing abandonment of the 27.71 miles not being purchased. Shortly thereafter the Commission approved the anticipated sale agreement between ICG and F & EP and dismissed the abandonment as to the 121.18-mile line.
 
 
 8
 When the sale did not go through ICG asked the Commission to reopen the proceeding, vacate the prior dismissal decision, and issue the abandonment certificate for the 121.18-mile segment. In response F & EP asked the Commission to await the outcome of a breach of contract action it had filed against ICG in state court.[6]
 
 
 9
 In May, 1984 the Commission reopened the proceeding pursuant to 49 U.S.C. Sec. 10327(G)(1) and its regulations at 49 C.F.R. Secs. 1152.2(e)(6) and 1152.27(p). The Commission found F & EP in default on the sales agreement and therefore vacated its prior dismissal of the abandonment petition for the 121.18-mile segment without waiting for the state court decision. The Commission decided that F & EP filed the state action only to delay the proceedings and that ICG should be protected from protracted legal matters. The Commission issued the 121.18-mile abandonment certificate. Pending review, this court stayed the Commission's decision insofar as it would have allowed ICG to remove the physical assets on the 121-mile segment.
 
 
 10
 The petitioners argue that the Commission lacked jurisdiction to reopen and revive the dismissed portion of the abandonment proceeding after the sale collapsed, and that to obtain an abandonment certificate ICG must reapply for abandonment authority. Petitioners also argue that ICG must continue to serve the line pending a decision on its reapplication. Petitioners rely upon 49 U.S.C. Sec. 10905(e) which provides that "[i]f the carrier and a person offering to purchase a line enter into an agreement which will provide continued rail service, the Commission shall approve the transaction and dismiss the application for abandonment."
 
 
 11
 Petitioners argue that 49 U.S.C. Sec. 10905(e) should be read to mean that the proceeding once dismissed is beyond resurrection. We see no need to read and apply that section so inflexibly as to prohibit reopening when the railroad seeking abandonment continues to experience financial losses and is not at fault for the failure of the sale. We construe this provision in light of the congressional desire to see abandonment proceedings expedited, a desire it evinced in 1980, when it shortened the time from six months to 110 days that a railroad seeking to abandon was required to negotiate with a financially responsible potential buyer. Compare 49 U.S.C. Sec. 1a(6)(a) (1976) with 49 U.S.C. Sec. 10905(c)-(f) (Supp. V); see also 125 Cong.Rec. 6440-41 (1979) (summary of the 1980 revisions stating that Congress intended to shorten abandonment delays and thus shorten the time the railroad would be operating at a loss).
 
 
 12
 Three other provisions of section 10905 that call for prompt abandonment authorization if an event disables a sale lend additional support. Section 10905(e) provides that if, within thirty days of an offer, the parties do not reach a voluntary agreement or ask the Commission to set terms, "the Commission shall immediately issue a certificate authorizing the abandonment...." Under section 10905(f)(2), when the Commission establishes the terms and the offeror thereafter withdraws its offer, the Commission must issue an abandonment certificate unless other offers are pending. Finally, section 10905(f)(5) states that if a subsidizer discontinues a subsidy, the Commission must issue an abandonment certificate at the carrier's request unless within sixty days another party enters into a qualified subsidy agreement. In these instances there are no statutory requirements to start the abandonment proceedings anew, and we see no reason to do so in a situation where a contemplated sale fails. The Commission's decision to reopen the abandonment proceeding rather than force the initiation of new proceedings expedited the abandonment decision and therefore accords with the statutory scheme.
 
 
 13
 The Commission's regulation implementing section 10905, 49 C.F.R. Sec. 1152.27(p), provides further support for the Commission decision to take jurisdiction. 49 C.F.R. Sec. 1152.27(p) provides that "[i]n the event any party to a financial assistance agreement defaults on the obligations thereunder, then any party to the agreement shall promptly inform the Commission. Upon notification, the Commission will take such action as it may deem appropriate." Moreover, the Commission has general power under 49 U.S.C. Sec. 10327(g)(1) to reopen a proceeding because of material error, new evidence, or substantially changed circumstances. Commission regulation 49 C.F.R. Sec. 1152.25(e)(6) authorizes the reopening of a final action in an abandonment proceeding based on the criteria in 49 U.S.C. Sec. 10327(g)(1).
 
 
 14
 Petitioners argue that even if the Commission had the authority to reopen, that authority expired within ten or twenty days of the action complained of. They cite two general Commission regulations relating to appeals of Commission decisions. But time limitations in appeals are not applicable to reopenings, as the purposes are so different as not to support an analogy. More importantly, under 49 C.F.R. Sec. 1115.4 a Commission final action may be reopened at any time on the grounds set forth in 49 U.S.C. Sec. 10327(g).
 
 
 15
 We find no error in the Commission's move to reopen rather than to require a new beginning of the abandonment proceeding.
 
 
 16
 Once reopened the petitioners then challenge the basis for the Commission's original abandonment determination. By its analysis the Commission found that the ICG loss occurring on the segments sought to be abandoned constituted a burden on interstate commerce outweighing the community loss through termination of service.
 
 
 17
 Specifically petitioners complain that ICG failed to supply its off-branch costs in usable form, thus denying protestants the effective opportunity to challenge ICG's off-branch figures. ICG at the time of the original abandonment proceeding was instituting a new computer system and could only make the basic record materials available for manual use and verification by petitioners. The burden of reviewing these voluminous materials fell on petitioners, and they failed to undertake the task. Although review may have been onerous, the petitioners' failure to review is their own fault. The Commission's acceptance of ICG figures of rail car costs without checking for accuracy is not, under the circumstances, arbitrary or capricious.
 
 
 18
 Petitioners further contend that the Commission should not have credited ICG's off-branch equipment cost figure since the Commission did not use the book value method approved by the then controlling Commission regulation, 49 C.F.R. Sec. 1152.32(g)(3) (1983). However, the Commission was doing what it was told to do in Missouri Pacific Railroad v. United States, 625 F.2d 178 (8th Cir.1980). Missouri Pacific set aside the depreciated book cost method set forth in the regulation and directed use of a depreciated replacement or current cost method. Although at the time of the abandonment hearing the Commission had not yet formally brought its regulation into accordance with the Eighth Circuit's ruling, it was conforming in practice. See, e.g., Chicago & North Western Transportation Co.--Abandonment, 366 I.C.C. 373, 375 (1982). Moreover, in a 1982 notice of proposed rulemaking, the Commission had informed the public that it intended to use replacement cost. Ex Parte (Sub. No. 5), Revision of Abandonment Regulations, 47 Fed.Reg. 43744 (Oct. 4, 1982). Under these circumstances we find no Commission error in the cost calculation method used.
 
 
 19
 Petitioners also argue that had the book cost method been used the segments would have been shown to be profitable, but this is true only if one ignores opportunity costs. When opportunity costs are considered, as they should be, Cartersville Elevator, Inc. v. ICC, 724 F.2d 668, 671 (8th Cir.1984), the segment is clearly unprofitable.
 
 
 20
 Petitioners also question the evidentiary burdens the Commission imposed on them. They argue that the Commission ruled that once a carrier shows operating losses the application should be granted unless the public comes forward with rebuttal evidence. Both parties agree that under the rule established by City of Cherokee v. ICC, 641 F.2d 1220, 1228 (8th Cir.), cert. denied, 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1981), the carrier has the burden of proving that abandonment is in the public interest. To meet this burden the carrier must present specific and accurate cost/revenue data contrary to petitioners' suggestion. Contrary to petitioners' suggestion, the Commission applied this burden on the carrier and did not shift the ultimate burden of persuasion onto petitioners. It held that once the carrier has established a prima facie case showing that the line imposes an undue burden on interstate commerce, the burden then necessarily shifts to petitioners to come forward with any contrary evidence. There is nowhere else for that burden to go under usual evidentiary concepts. We find no error in the Commission's procedural view of evidentiary responsibilities.
 
 
 21
 Petitioners further claim that the Commission unfairly permitted ICG to include certain bridge traffic expenses on this line, but to exclude all the revenue produced by the bridge traffic. Once again we do not believe this is an accurate statement of what the Commission in fact did.
 
 
 22
 The only bridge traffic expense ICG considered was car costs. The Commission determined that the bridge traffic was not sufficient to increase the other expenses customarily associated with bridge traffic (such as fuel, locomotive use, and maintenance-of-way) beyond the level required for traffic which either originated or terminated on these segments.
 
 
 23
 Petitioners also argue that bridge traffic carload expenses and revenue could have been easily calculated by ICG, and should have been considered. But petitioners had access to the records to make their own calculations if they saw some significance in them. We see no need to require that bridge traffic expenses and revenue be otherwise considered under the facts in this case than as found by the Commission.
 
 
 24
 In any event petitioners argue the original abandonment proceedings should have been reopened because of changed circumstances. The record was stale they say and there were new considerations such as a per car surcharge imposed by ICG permitted under 49 U.S.C. Sec. 10705a(b) when a light density rail line does not produce sufficient revenue compared to certain costs. It cannot, however, be claimed that the imposition of a surcharge by ICG might have caused a decrease in traffic with an impact on ICG's loss calculations. The surcharge was only in effect for about six months in 1983. Even if the lifting of the surcharge caused some lost traffic to return to the line there was no suggestion it would constitute an increase over traffic before the surcharge. There is not enough in this limited issue to cause reopening.
 
 
 25
 Petitioners also seek to divide the proceedings by separating segments on which service continues from segments on which service has been discontinued. In Indiana Sugars, Inc. v. ICC, 694 F.2d 1098 (7th Cir.1982) we did require the Commission to take another look at a segment where abandonment would have deprived a major shipper of feasible transportation service. The protestant had a large bulk operation generating a flow of about 700 cars a year to and from its plant over the segment in question. We found it would inflict serious hardship on that company, and that the Commission had not calculated with sufficient precision what the financial burden on the carrier would be if the rail service was to be continued. That shipper was left without other transportation service, but that is not an issue in the present case. In this central Illinois area the services of another railroad, river barges, and about 75 motor common carriers are available.
 
 
 26
 That portion of the line that continues to operate was in order to facilitate the sale of an operational line, not an abandoned line. That temporary service for sale purposes does not suggest that all of a sudden the segment had become more profitable.
 
 
 27
 Some crew reduction resulting from discontinued service on some segments does not merit re-examination. The Commission found it was a losing proposition even utilizing only one crew without regard to the million and a half dollar loss in opportunity costs that ICG endures until its disposal of the assets. Possible asset removal and disposal pending termination of the litigation was stayed by this court.
 
 Conclusion
 
 28
 In view of our limited standard of review in abandonment cases, Indiana Sugars, 694 F.2d at 1099-1100, we find that the Commission has not failed in its responsibilities in this case in applying its expertise in weighing the relevant factors bearing on the public interest. We have considered all the arguments of petitioners and find them to be without sufficient merit to cause the proposed abandonment to be renewed, reopened or set aside.
 
 
 29
 The Petitions for Review are therefore denied and this appeal is dismissed.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 At the time the petition was filed, Patrick W. Simmons was Illinois Legislative Director for United Transportation Union. ICG, State of Illinois, Illinois Commerce Commission, and F & EP are intervenors on this petition
 
 
 [2]
 This second petition was filed by the State of Illinois, Illinois Commerce Commission, and Simmons. ICG is an intervenor. F & EP filed a third petition which was later dismissed for want of prosecution
 
 
 [3]
 Three other related petitions for review were filed concerning the same line. In No. 83-2795, now dismissed, the Prairie Central Railway Company sought review of the Commission's determination that it was not financially responsible thereby relieving ICG of the need to negotiate with it to sell the whole line authorized to be abandoned
 In Petition No. 84-1815, F & EP sought its own review of the Commission's May 10, 1984 decision, but that petition was dismissed for want of prosecution.
 In Petition No. 83-1833, Prairie Central sought review of the Commission's rejection of its purchase application. Prairie Central later withdrew its petition.
 
 
 [4]
 Prairie Central offered to purchase the entire 148.89 miles, but was found not financially responsible
 
 
 [5]
 "Off-branch" costs are the portion of costs to be discontinued but which are not incurred on that segment
 
 
 [6]
 On April 19, 1985 judgment was entered in the state court action in favor of ICG