Jack O. BLACK, W.C. Gandert and J.J. Hults, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents.

Wabash Railroad Company and Norfolk and Western Railway Company, Intervening Party Respondents.

LaGRANGE COUNTY, INDIANA, et al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents.

Wabash Railroad Company and Norfolk and Western Railway Company, Intervening Party Respondents.

Nos. 81–2775, 81–2776.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 4, 1984.

Decided June 15, 1984.

Gordon P. MacDougall, Washington, D.C., Carl M. Miller, Miller & Miller, New Haven, Ind., for petitioners.

Edward J. O'Meara, I.C.C., Washington, D.C., for respondent.

Angelica D. Lloyd, Norfolk & Western Railway Co., Roanoke, Va., for intervening party respondents.

Before CUMMINGS, Chief Judge, and PELL and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

Petitioners, three officials of the United Transportation Union ("UTU") and various shippers and communities, seek review of a decision of the Interstate Commerce Commission (the "ICC" or the "Commission") permitting the Wabash Railroad Company ("Wabash") and the Norfolk and Western Railway Company ("N & W") to abandon their 71.89-mile line of railroad between Pergo, Ohio and Wakarusa, Indiana. We vacate the grant of authority to abandon the subject line and remand to the ICC for reconsideration of N & W's application.

## I. Background

The railroad line which N & W and Wabash seek to abandon is owned by Wabash but leased to and integrated into the system of N & W. It is part of the eastern portion of the Gary District line which extended from Chicago to Detroit. The portion which is the subject of this abandonment proceeding extends from Wakarusa, Indiana east to Pergo, located just west of Montpelier, Ohio (see accompanying map). Other lines owned by either Wabash or N & W connect Montpelier to Detroit, Michigan, Toledo, Ohio and Chicago by way of Fort Wayne, Indiana. The line proposed for abandonment here meets FRA Class I standards, with parts meeting FRA Class II standards. The line is safe for operations at 10 m.p.h. There have been no major derailments and no rehabilitation is deemed necessary to bring the line up to the Class I standard. The inbound traffic on the line consists primarily of fertilizers, fertilizer compounds, lumber and lumber products. Most of the outbound traffic is grain. The line is also used for transportation of "overhead" or "bridge" traffic (essentially traffic not originating or terminating on the line), which is mostly associated with the automobile industry.

In July 1980, Wabash and N & W filed an application under 49 U.S.C. §§ 10903 and 10904 (Supp. V 1981) for authority to abandon these 71.89 miles of trackage. Af-

ter shippers, local government officials and labor groups filed protests, the petition was referred to an administrative law judge ("ALJ") who granted authority to abandon in July 1981. The ALJ found that the N & W showed on an "actual" basis a profit from operation of the line of $109,-980 in 1978 and $201,020 in 1979. These figures were derived from total revenues attributable to this segment of the line, including the bridge traffic.

However, the ALJ substituted a projected maintenance cost of $358,616 for the actual $75,947 expended by N & W in 1979, based on her finding that this sum would be necessary for renewal (or normalized) maintenance because the actual maintenance expenditures had not preserved the condition of the line. She rejected N & W's estimated cost of rehabilitating the line above the FRA Class I standard because N & W had not made the requisite showing why this would be commercially reasonable. *Wabash Railroad Company and Norfolk and Western Railway Company-Abandonment-in Elkhart, LaGrange, Noble and Steuben Counties, Indiana and Williams County, Ohio,* Interstate Commerce Commission Decision No. AB–10 (July 10, 1981) at 14, Joint Appendix at 25 (*"Wabash I "*). Utilizing this renewal maintenance figure, the ALJ calculated that, in the base year 1979, N & W would have incurred an operating loss of $78,513. In addition, the ALJ determined that N & W had incurred an opportunity cost of $197,678 from continued operation of the line. *Id.* at 15, Joint Appendix at 26.[1] Including figures for the normalized maintenance cost and the opportunity cost, the ALJ found that N & W had a total economic burden of $276,191 attributable to the line in the projected base year.

The ALJ then balanced this burden of continued operations against the impact on community and rural development as required under 49 U.S.C. § 10903(a). Be-

cause the bridge traffic would be rerouted along parallel lines, the ALJ found that the bulk of the traffic utilizing this line would not be affected. The ALJ also determined that, on the other hand, the extent to which local shippers used the line did not justify the burden on N & W, and these local shippers would have the option of making a timely offer of assistance to purchase or subsidize the operation of all or part of the line under 49 U.S.C. § 10905.

This decision was then appealed to the ICC which decided, under 49 U.S.C. § 10904(c)(3), to consider the appeal. The ICC, on October 13, 1981, affirmed the decision of the ALJ, specifically rejecting protestants' challenges on several issues, including the use of normalized maintenance costs, N & W's alleged deliberate downgrading of the line and the consideration of opportunity costs in the calculation of total economic burden. *Wabash Railroad Company and Norfolk and Western Railway Company-Abandonment-In Elkhart, LaGrange, Noble and Steuben Counties, Indiana and Williams County, Ohio,* Interstate Commerce Commission Decision No. AB–10 (October 13, 1981), Joint Appendix at 40 (*"Wabash II "*). After protestants filed petitions to stay the effectiveness of the certificate and decision, the ICC denied a stay and, in recomputing the normalized maintenance figures used by the ALJ, determined that the projected maintenance cost should be increased from $358,616 to $416,213 per year.

After the ICC's affirmance, South Milford Grain Company ("South Milford"), one of the grain shippers located along the line, filed an offer to purchase a 38-mile portion of the line between Pergo and Wolcottville in accordance with 49 U.S.C. § 10905. The Commission, however, rejected South Milford's offer of financial assistance on the grounds that it had not established itself as a financially responsible person capable of

---

**1.** The term "opportunity cost" here refers to the return on investment which could be realized if the railroad could invest its assets more profitably elsewhere. The ICC defines the term as "the real economic loss an entity experiences when it

must forego some other, more profitable use of its resources." *Abandonment of Railroad Lines-Use of Opportunity Costs,* 360 I.C.C. 571 (1980), *aff'd sub nom. Farmland Industries, Inc. v. United States,* 642 F.2d 208 (7th Cir.1981).

fulfilling its intention to purchase and operate the line. In addition, petitioners assert that N & W resisted South Milford's offer because N & W intended to sell a portion of the line to Hillsdale County Railway Company ("HCRC") after abandonment was authorized.

On December 22, 1981, the ICC decided to vacate the previously-issued certificate of abandonment and to reopen the proceedings at the request of several of the protestants in order to consider additional evidence relating to the prospect of future coal traffic. In its second decision, *Wabash Railroad Company and Norfolk and Western Railway Company-Abandonment-in Elkhart, LaGrange, Noble and Steuben Counties, IN, and Williams County, OH*, 366 I.C.C. 820 (December 10, 1982) ("*Wabash III*"), the ICC first adjusted its calculation of N & W's financial situation based on newly submitted operational data for the calendar year 1981. The ICC reduced certain of N & W's cost figures but accepted N & W's calculations on avoidable labor costs and normalized maintenance costs, concluding that N & W had an operational loss for the line in 1981 of $290,026. The ICC also adjusted downward N & W's opportunity cost applicable to operation of the line, determining that this figure should be $155,860.

The primary issue in the reopened proceeding, however, was the prospect of future coal traffic over the line in conjunction with the HCRC line. HCRC is a privately owned short-line railroad which operates under state and federal subsidy in southern Michigan and northern Indiana. At the

time N & W had opposed South Milford's offer of financial assistance, HCRC had submitted a statement that it intended to purchase 23.5 miles of the line between Ashley-Hudson, Indiana, and Pergo, Ohio (the eastern end of the line which N & W sought to abandon) after the abandonment. The existing HCRC line (predominantly Conrail track leased by HCRC) extends from Litchfield, Michigan, where the Michigan South Central Power Agency (the "Power Agency") intended to operate a new coal-fired electric generating plant, south to Steubenville, Indiana, which is 4 miles east of the interchange on the N & W line at Ashley-Hudson. The source of this coal for the new utility plant is Sherrodsville, Ohio, located on another N & W track which interchanges at Montpelier (just east of Pergo) with the portion of the N & W line which HCRC has proposed to purchase after the abandonment.

Because the ICC assumed that the sale of the Pergo to Ashley-Hudson portion of the line to HCRC would take place after abandonment, in calculating the amount of revenue contributed to N & W by this coal traffic which would be lost after abandonment, the ICC considered as lost only the revenues generated by the Montpelier to Steubenville movement. The protestants, however, argued that the revenues of the entire movement from Sherrodsville to Steubenville should be considered as lost because the proposed sale to HCRC, which was not made as an offer of financial assistance, is not relevant to these proceedings.[2] By the ICC's method of calculation in its second decision, the amount of reve-

---

2. The protestants contend that the proposed sale of track to HCRC constitutes the sale of a line between two operating rail carriers and that either HCRC and N & W should be required to seek ICC approval of the sale under 49 U.S.C. § 11343 or HCRC should be required to meet the criteria to qualify as an offeror of financial assistance under 49 U.S.C. § 10905. The ICC, however, contends that this transaction constitutes an abandonment by one carrier under 49 U.S.C. § 10903 and a subsequent acquisition by another carrier of trackage no longer in interstate commerce under 49 U.S.C. § 10901. In its decision, the ICC rejected protestants' reasoning, stating that, once authority to abandon a line

had been granted, another carrier could then purchase it without having to comply with 49 U.S.C. § 11343 because the abandoned line would no longer be operating in interstate commerce. *Wabash III*, 366 I.C.C. at 822. However, because there was no application before it from HCRC to purchase a portion of the line, the ICC also stated that HCRC's interest in the acquisition was not relevant to a determination of N & W's request to abandon the line. *Wabash III*, 366 I.C.C. at 838. The protestants therefore argue that the ICC, in considering the abandonment petition itself, cannot include the effects of this proposed sale on N & W's future revenues after abandonment.

nue which N & W would lose as a result of the abandonment would have been considerably less, amounting to a range of $48,750 to $64,350, depending upon the amount of coal traffic projected. By the protestants' method, which assumes that after abandonment N & W would lose revenues from the entire Sherrodsville to Steubenville movement (because there would be no service available from Montpelier to Steubenville), N & W's losses attributable to abandonment of this line would amount to a range of $380,000 to $501,600, using the same amount of coal traffic projected by the ICC in deriving its revenue estimates.

Further, the ICC noted that the two other methods by which coal could be transported from Sherrodsville to Litchfield, if the HCRC–N & W combined lines were not available, would not be desirable. *Wabash III*, 366 I.C.C. at 832–33. One of these available methods would be by motor carrier because the relevant motor carriers have offered rates comparable to rail transportation. The Power Agency, however, stated that it preferred rail shipment because the rail and motor rates may, in fact, vary over time and because the rail alternative serves as a competitive restraint on motor carrier rates. The other suggested methods would require that the coal be shipped via a circuitous route over a Conrail line, which is in need of substantial rehabilitation. The ICC thus concluded that "use of the subject line in connection with HCRC's system is the most efficient and economical method of delivering coal to the Litchfield plant." *Wabash III*, 366 I.C.C. at 833. In its decision, however, the ICC used this conclusion only to substantiate its determination that the HCRC route would continue to be used after abandonment and thus also its calculation of the lower revenue losses as a result of abandonment. Finally, the ICC found that protestants had failed to carry their burden of demonstrating that the merger of N & W with the Southern Railway Company ("Southern") would result in sufficient savings that the line would in the future be operated profitably. The ICC thus affirmed its earlier decision and granted the application for abandonment.

The protestants again requested the ICC to stay the effectiveness of its decision pending judicial review and a determination on their joint petition to reopen. The ICC denied the stay but indicated that it would issue another decision concerning protestants' latest petition to reopen, filed January 10, 1983. On January 13, 1983, South Milford filed a second offer to acquire a portion of the line, but the ICC rejected this offer on the ground that it was not proper at that stage of the proceedings. On February 2, 1983, this court granted a stay pending judicial review, and, on June 2, 1983, the ICC issued its third decision again affirming its prior decisions to authorize abandonment. *Wabash Railroad Company and Norfolk and Western Railway Company-Abandonment-Elkhart, LaGrange, Noble and Steuben Counties, IN, and Williams County, OH*, 366 I.C.C. 896 (June 2, 1983) ("*Wabash IV*").

In this third decision, the ICC, instead of using projections, recomputed the revenues realized by N & W based on actual data for the coal movements which had commenced in November 1982. As before, the Commission calculated the revenue contribution of the line for which N & W seeks abandonment by allocating only a proportionate share of the net contribution of the coal traffic to that line. This share as determined by the ICC is approximately 10% of the total revenues realized by N & W from the coal traffic originating at Sherrodsville for delivery to the Power Agency. Because the coal traffic proved to be more profitable than previously projected, the amount attributed to the line proposed for abandonment was increased to a range of $80,000 to $105,000, based on net revenues of $850,000 to $1,122,000 from the coal traffic as a whole. *Wabash IV*, 366 I.C.C. at 898–901. The ICC again rejected the protestants' contentions that the HCRC proposed purchase should be required to meet the criteria of 49 U.S.C. § 11343 or 49 U.S.C. § 10905 and that the N & W-Southern merger necessitated reconsideration of N & W's application. The ICC also rejected other arguments which had been con-

sidered in its prior decisions. *Wabash IV,* 366 I.C.C. at 903–06. In conclusion, the ICC determined that, when normalized maintenance is considered, N & W suffered $290,026 of avoidable losses and incurred at least $155,860 in opportunity costs from the operation of this line. The ICC, therefore, affirmed its prior decision to grant authority to N & W to abandon the line.

Petitioners, officials of UTU and several communities and shippers located along the line, particularly South Milford, assert that the ICC committed several errors resulting in an arbitrary and capricious determination to grant N & W's abandonment application. The most important of these alleged errors by the ICC are: (1) the failure to credit the line with appropriate net revenue from N & W's shipment of coal; (2) the failure to consider South Milford's second offer of financial assistance; (3) the failure to consider the impact of the N & W-Southern merger on N & W's revenues from the line; (4) the use of normalized maintenance figures in place of actual maintenance costs; (5) the failure to consider N & W's alleged refusal to handle traffic for the purpose of downgrading and diminishing the revenue attributable to the line proposed for abandonment; and (6) the failure to consider the effect of an economic recession on non-coal traffic.

## II. Scope of Review

■ A railroad is permitted to abandon part of a rail line only if the ICC "finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903(a). The burden is on the railroad applying for the certificate of abandonment to show that the present or future public convenience and necessity require or permit the abandonment. 49 U.S.C. § 10904(d)(1). In making its determination of public convenience and necessity, the ICC is to exercise its discretion in balancing the burden to the railroad of providing the service against the benefits accruing to the public from the service. *Chicago & Northwestern Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311,

320, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981); *Bloomer Shippers Association v. Interstate Commerce Commission,* 679 F.2d 668, 672 (7th Cir.1982). The Commission's authority in making its determination is broad, so the scope of judicial review of the ICC's decision is correspondingly narrow. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Simmons v. United States,* 698 F.2d 888, 894 (7th Cir.1983).

The standard of review to be applied to an ICC abandonment determination has been the subject of some debate in this circuit, but, because the statute allows the ICC to make an abandonment determination without a public hearing, the arbitrary, capricious or abuse of discretion standard has generally been adopted as the more appropriate. 49 U.S.C. § 10904(c)(1); 5 U.S.C. § 706(2)(A). The substantial evidence standard, on the other hand, applies when public hearings are required by statute. 5 U.S.C. § 706(2)(E). Previous decisions of this court have held that, under the particular circumstances of those cases, these two standards of review are the same for all practical purposes. *Simmons v. United States,* 698 F.2d at 894; *People of the State of Illinois v. United States,* 668 F.2d 923, 930 (7th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982).

■ Petitioners here apparently challenge the Commission's findings and conclusions on the bases only that they are allegedly arbitrary, capricious and an abuse of discretion and that they were made "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). *See also People of the State of Illinois v. Interstate Commerce Commission,* 698 F.2d 868, 871 (7th Cir.1983) (utilizing *both* the arbitrary and capricious standard and the substantial evidence standard); *Bloomer Shippers Association,* 679 F.2d at 672 (same); *People of the State of Illinois v. United States,* 666 F.2d 1066, 1072 (7th Cir.1981) (adopting "arbitrary and capricious" standard). *Cf. People of the State*

*of Illinois v. Interstate Commerce Commission,* 722 F.2d 1341 (7th Cir.1983) (not discussing appropriate standard of review). We shall therefore employ the arbitrary and capricious standard in our review of this ICC decision to grant a certificate of abandonment to N & W.

### III. Coal Shipment Revenues

■ As previously noted, in determining how much of the coal revenue to attribute to the line which N & W seeks to abandon, the ICC attributed only a proportionate share (approximately 10%) of the total revenues which N & W realizes on the theory that, because of the proposed sale of part of the line to HCRC, N & W will retain the coal traffic movements from Sherrodsville to Montpelier after the abandonment. As the ICC itself recognized in its third opinion, *Wabash IV,* 366 I.C.C. at 899–900, this method of attribution represents a clear departure from its regulations and its prior practices.

The applicable regulation provides:

> The revenue attributable to the rail properties is the total of the revenues assigned to the branch in accordance with this section....
>
> (a) *Account 101—Freight.* The revenue assigned under this account shall be the actual revenues ... accruing to the railroad ... for all traffic that:
>
> \* \* \* \* \* \*
>
> (2) Originates or terminates on the branch and is handled off the branch on the system but not on another carrier;
>
> \* \* \* \* \* \*

All traffic that is received or forwarded through interchange at a point on the branch ... shall be considered as originating or terminating on the branch. The revenues of all other bridge or overhead traffic shall be attributed to the branch on the ratio of miles moved on the branch to miles moved on the system....

49 C.F.R. § 1152.31 (1983). This regulation means, among other things, that any traf-

fic which is interchanged on the branch should be treated as if that traffic originates or terminates on the branch. Following this approach, the ICC should have calculated the revenues to be lost here as a result of abandonment on the basis of the method used for branch traffic, not for bridge traffic, and as if the carrier would lose *all* revenues from such traffic. In the present case, the coal traffic now interchanges at Ashley-Hudson with the HCRC line and should have been treated as terminating there. The Commission, therefore, according to the methodology of the regulation, should presumably have attributed all the revenues from the coal traffic to the subject line.

The regulation in question also provides for a "ratio" method of attributing revenue from bridge or overhead traffic to a particular line. This "ratio" method applies when alternate routing is available, as it is in the case of bridge traffic. In those circumstances, the carrier will not lose the entire revenue from traffic which moves in part along the line which the carrier seeks to abandon. According to this ratio method, the amount of revenue to be attributed to the subject line is based on a ratio of the number of miles the traffic is moved on the subject line to the number of miles which it is moved along other lines of the carrier's system.

While conceding that, according to its regulation, the N & W coal traffic revenues should have been calculated under the first (or "total loss") method, the Commission took what is viewed to be a more realistic approach and applied the ratio method. It justified this by pointing out that, as with bridge traffic, alternate routing was available, primarily in the form of the HCRC line if HCRC purchased the eastern segment of the subject line after abandonment. The ICC noted that, "while the proposed sale to HCRC of the Montpelier-Steubenville segment has no bearing upon and was not considered in our decision to grant the abandonment, we cannot ignore the fact that the sale has been approved by the management of both carriers and is likely

to take place." *Wabash IV*, 366 I.C.C. at 900. The ICC also relied secondarily on the availability of a second alternate route involving the Conrail line.

The ICC's decision to apply the "ratio" method, while at first glance appearing to be realistic, presents problems of application. First, from one perspective, the Commission is presumably obligated to follow its own regulations unless it can adequately justify its departure from them.[3] Second, and more significantly, its attempted justification for this departure is based on the assumption that the alternate routing which is available will result in N & W's retention of approximately 90% of the revenues which it now realizes from the coal traffic. The ICC's reliance on the alternate route involving the Conrail system may be unrealistic in light of its earlier conclusion that any other route would be circuitous and that the Conrail line, in particular, was in need of substantial rehabilitation. *Wabash III*, 366 I.C.C. at 833. The ICC's decision to permit abandonment is, however, primarily based on the assumption that HCRC will purchase part of the subject line, although the ICC itself had, in another context, described this sale as having no bearing on the present case.

If the ICC seeks to base its conclusion on the occurrence of this sale, then N & W and HCRC should be required to observe either the usual procedures provided for approval of a sale of operating track under 49 U.S.C. § 11343 or the procedures for treating the matter as an offer of financial assistance by HCRC pursuant to 49 U.S.C. § 10905. If, on the other hand, N & W and HCRC want to conclude this sale under 49 U.S.C. § 10901, in a transaction which can occur only *after* N & W has already abandoned the line, then it does not seem proper to permit the ICC to rely on the results of this sale, which has not yet taken place, in determining whether to permit the abandonment in the first instance. The Commission has also failed to calculate the amount of revenue to be attributed to the subject line if the Conrail alternate route were utilized.[4] In addition, in considering the uncertainties of the alternate routings, whether utilizing the Conrail or the HCRC lines, the ICC has neglected to consider that, if the alternate routes are not sufficiently attractive, then an option of using motor carriers remains available to the Power Agency. *Wabash III*, 366 I.C.C. at 832-33. If motor carrier transport were employed by the Power Agency, then N & W could lose the entire revenue from the Sherrodsville to Steubenville coal movement.

The ICC had previously concluded that neither the Conrail route nor the motor carrier transport alternative was as efficient or economical as the combined HCRC–N & W route. It is therefore questionable for the Commission to rely on the existence and availability of such a combined route before the sale has actually been consummated—an event which cannot occur before abandonment unless N & W

---

**3.** When an administrative agency promulgates rules to govern its proceedings, these rules must be scrupulously observed.... For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules. If an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand.
*Pacific Molasses Co. v. Federal Trade Commission,* 356 F.2d 386, 389–90 (5th Cir.1966) (citation omitted). *See also Pearce v. Director, Office of Workers' Compensation Programs, United States Department of Labor,* 647 F.2d 716, 726 (7th Cir.1981); *National Conservative Political Action Committee v. Federal Election Commis-* *sion,* 626 F.2d 953, 959 (D.C.Cir.1980) (an agency cannot depart from its regulations and procedures without providing a rational explanation and prior notice to parties relying upon the past practice); *Panhandle Eastern Pipe Line Co. v. Federal Energy Regulatory Commission,* 613 F.2d 1120, 1135 (D.C.Cir.1979), *cert. denied,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980) (an agency is bound by its own regulations).

**4.** The Commission stated in its third opinion that the revenues retained if the Conrail alternate were used would be comparable to those realized if the HCRC route were used. *Wabash IV*, 366 I.C.C. at 900. However, the ICC presented no data or evidence to support this conclusion.

and HCRC comply with the statutory requirements.

In *People of the State of Illinois v. United States,* 604 F.2d 519 (7th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980), this court approved an ICC decision to permit acquisition by a non-carrier of part of a line which the carrier had previously sought to abandon but for which the ICC had refused to allow abandonment because the shippers located along it provided adequate revenues to the carrier. Both in that case and in other cases cited in it, the Commission essentially dismissed a pending abandonment application while approving a simultaneous acquisition by a new applicant. *Id.* at 525–26. In the case before us, the purchase by HCRC seems distinguishable in that HCRC is currently a carrier (and, of course, the ICC has *allowed* abandonment). However, the other cases cited provide an appropriate method by which the Commission could ensure that the public convenience and necessity are served in approving the abandonment of the eastern segment of the subject line only if simultaneous with, and conditional upon, the acquisition of that segment by HCRC.

Such a procedure, or some other procedure adequately linking HCRC's acquisition to the abandonment, would then render the ICC's use of the "ratio" method by which it apportioned only part of the coal traffic revenues to the subject line clearly both reasonable and justified. Without greater certainty that the sale to HCRC will take place, however, the ICC's calculation of the coal revenues to be lost through abandonment of the subject line by use of a ratio method rather than through assumption of a total loss appears, particularly in light of the regulations, to be so arbitrary as to amount to an abuse of its discretion. We must therefore remand this application to the ICC for reconsideration of the attribution of coal revenues in the event of abandonment and related problems.[5]

## IV. South Milford's Second Offer of Financial Assistance

Under 49 U.S.C. § 10905(c), once the ICC has decided to permit an abandonment, it must publish its findings in the Federal Register. Within ten days of this publication, any person may make an offer of financial assistance to the carrier or an offer to purchase the line. If the ICC finds that the offer is adequate and that the offeror is a financially responsible person, then issuance of the certificate of abandonment is delayed while an agreement between the carrier and offeror is achieved under the auspices of the ICC.

Following the ICC's first decision on October 15, 1981, to permit the abandonment, South Milford made an offer of financial assistance which the ICC rejected on the ground that South Milford was not a financially responsible person. Following the ICC's second decision on December 12, 1982, South Milford made a second offer which, it claims, differed significantly from the first offer.[6] The ICC, however, reject-

---

**5.** Petitioners also challenge the Commission's calculation of car costs used in its determination of the amount of revenue derived from this coal traffic. In its second opinion, the ICC rejected the car costs suggested both by N & W and by the protestants and calculated its own figures based on information which the ICC claims was available to the protestants. *Wabash III,* 366 I.C.C. at 836. Petitioners now contend, however, that that information was not available and was not part of the record so that the ICC cost estimates were arbitrary and capricious because not supported by evidence. Shipper Petitioners' Brief at 6–10. While we do not need to reach this issue in light of our remand on other grounds, it is clear that the ICC will need to recalculate the entire basis of the revenues attributed to the subject line from the coal

traffic. However, it does not seem to have been an abuse of discretion for the ICC to have calculated its own estimate of car costs once it rejected both N & W's and protestants' figures (despite the petitioners' assertion that once the ICC rejected N & W's figures it was obligated to accept those proposed by the protestants, see Shipper Petitioners' Brief at 7). Nevertheless, it is incumbent upon the ICC to utilize only information in the public record (such as forms provided in ICC regulations) or information in the record of this particular abandonment proceeding.

**6.** In its first offer of financial assistance, the principals of South Milford did not pledge their personal assets. Its second offer was, however, backed by the personal assets of its sharehold-

ed this second offer, claiming that it was not timely. The essence of the shippers' argument is that South Milford should have been permitted to make a second offer after the ICC vacated the abandonment certificate and reopened the proceedings. The Commission, on the other hand, claims that its reopening of the proceedings, unlike a vacating of a decision, did not trigger a requirement that it republish its findings in the Federal Register and so South Milford did not merit a second opportunity to make an offer under 49 U.S.C. § 10905(c).

■ The disagreement between South Milford and the ICC seems to depend on the somewhat formalistic distinction between vacating a decision and reopening a proceeding. Both parties seem to agree that following a remand from this court, which vacates the ICC decision, a new publication and a new period for offers of financial assistance are required. *See International Minerals & Chemical Corp. v. Interstate Commerce Commission,* 656 F.2d 251 (7th Cir.1981) (following remand from appellate court, ICC issued new certificate and order and published findings in Federal Register); *City of Cherokee v. Interstate Commerce Commission,* 641 F.2d 1220 (8th Cir.1981) (same).

■ Because the ICC decision, as previously discussed, is being vacated and remanded for other reasons, South Milford will have another opportunity to make an offer of financial assistance regardless whether the ICC's refusal to consider its second offer was correct. However, we would note in addition that, when the ICC decided to reopen its decision, it did so because the evidence concerning the coal movements to the power plant at Litchfield, Michigan, was not previously before it. Such data could significantly change the Commission's conclusion concerning the future profitability of the line. In reopening the proceedings, the ICC permitted new evidence and testimony to be presented at oral hearings. Therefore, whether or not the ICC formally vacated its previous decision, its new decision would have to present and to rely upon new findings, primarily about coal revenues, even if the ultimate conclusion of the Commission were to remain unchanged, as was the case. It therefore seems that, at least under the particular circumstances of this case, the ICC, in accord with 49 U.S.C. § 10905(c), should have published its subsequent findings in the Federal Register, thus triggering another ten day period during which South Milford, or anyone else, could have made an offer of financial assistance or an offer to purchase the line.[7] The same new evidence which prompted the ICC to reopen its decision could presumably have led South Milford or others to make new offers or substantially different offers based on this evidence. *Supra* n. 6.

## V. Effects of the N & W-Southern Merger

■ Approximately two weeks after hearings were held in the reopened proceeding to consider the new evidence concerning increased revenues from coal traffic, the ICC approved a consolidation of N & W and Southern at the end of March

ers. Shipper Petitioners' Brief at 23–24. The ICC never considered whether this change would have rendered South Milford a financially responsible person under 49 U.S.C. § 10905(d)(1). Regardless of the significance of this change in the form of the offer, it would seem that the increased revenues from the coal traffic would affect both the form of an offer of financial assistance and the financial viability of an offeror who intended to finance the purchase through revenues derived from operation of the purchased line as South Milford apparently expected to do.

**7.** In its notice of final rules promulgated after passage of the Staggers Rail Act of 1980, the Commission commented that, when a decision to permit abandonment is appealed, a subsequent decision upholding the earlier one will not give rise to a new period in which offers of financial assistance can be made. 365 I.C.C. 249, 257 (1981). Whether this statement is intended to apply to reopened hearings is unclear; however, the logic of permitting a new period for offers of financial assistance remains valid in a case, such as this one, in which the factual basis underlying the Commission's decision will be significantly altered in the reopened proceeding.

1982. *Norfolk Southern Corp.-Control-Norfolk & Western Railway Co.*, 366 I.C.C. 171 (1982). The consolidation transaction was completed in June 1982. At the hearings in March, protestants had failed to cross-examine N & W's witnesses concerning the possible effects which the consolidation would have on the future profitability of N & W's operations, including that of the line which N & W seeks to abandon. In both its second and third decisions, the ICC refused to consider the effects of this consolidation, largely because the period of time in which the consolidation had been in effect was too short for meaningful revenue data reflecting the merger to be available. Petitioners, on the other hand, allege that the ICC was obligated, under 49 C.F.R. § 1152.22(d)(5), to recalculate the revenue data for 1978, 1979 and 1981, on which the Commission had relied in making its determination, as if the merger had been in effect at that time.

As with the conclusion which we reached concerning South Milford's second offer of financial assistance, it is not necessary for us to reach the underlying merits of this issue. Because we are remanding this case to the Commission on the issue of attribution of revenues from coal traffic, the ICC will have to reconsider various aspects of its prior determination. At that time, it would seem appropriate for the ICC in making its new determination, particularly in light of the intervening merger, to request financial data from N & W at least for the year 1982 and, if available, for the year 1983 as well.

This new data will reflect the results of the merger and so will accord with 49 C.F.R. § 1152.22(d)(5), which requires that the revenues of an entire railway system be considered in an abandonment proceeding. We cannot state, however, that the

ICC's failure to consider the effects of the merger in its 1982, and even its 1983, deliberations was in itself clearly an abuse of discretion because the data at that time were largely unavailable. Further, requiring the ICC to hypothesize what the effects of the merger would have been on the basis of data for previous years seems to go beyond the dictates of the appropriate regulations and might lead to a determination based on speculation. Finally, the Commission did not apparently commit an abuse of discretion in failing to reopen its proceedings specifically to consider the effects of the merger because, as this court has stated previously, the record need only be reopened in the most extraordinary circumstances.

> Decision making would be much less final if reopening a case were regularly required because of new evidence. There is always a delay between the end of a hearing and the time when an agency issues its decision, and there frequently is some new evidence discovered in the interim with arguable bearing on the case.

*Simmons v. United States*, 698 F.2d at 900.[8] Under the particular circumstances of this case, the ICC's failure to consider the effects of the merger did not constitute a clear abuse of discretion. Upon remand, which will necessitate reopening of the record, however, the ICC should consider more recent financial data which will reflect the effects, if any, of the merger on the operation of the line which N & W seeks to abandon.

### VI. Other Claims

■ Petitioners allege that the ICC committed several other errors which constituted an abuse of discretion. These con-

---

**8.** Petitioners attempt to distinguish *Simmons* by pointing out that *Simmons* was a review of further ICC action taken after remand by this court in *People of the State of Illinois v. United States*, 666 F.2d 1066 (7th Cir.1981). As in this case, we remanded to the ICC because the ICC had abused its discretion in other aspects of its determination. The court therefore required that the Commission upon remand take into account the effects of the merger, which had occurred in the interim between agency action and judicial review. *Id.* at 1081. The court did not, however, specially remand because the ICC had not previously considered the effects of the merger. Our holding on this point therefore follows directly from our decisions in *People of the State of Illinois* and in *Simmons*.

tentions need be considered only briefly. The first of these points involves the ICC's use of "normalized" rather than actual maintenance costs in determining N & W's operational costs on the subject line. The basis of petitioners' argument is that the normalized maintenance cost figures used by the ICC in attributing costs to the subject line reflect the maintenance which would be required to operate the track above the FRA Class I level. Maintenance at this level, petitioners argue, is unnecessary and, if actual cost figures were used, the resulting calculation would reveal that the line does in fact operate at a profit.

The use of normalized rather than actual maintenance figures was specifically approved in *International Minerals & Chemical Corp. v. Interstate Commerce Commission*, 656 F.2d 251, 256–58 (7th Cir. 1981), in which this court stated that "[i]f the deferral of maintenance showed profitability figures for certain years, it is important that the ICC know that fact when considering an abandonment application." *Id.* at 257. The ALJ specifically stated in her opinion that the normalized maintenance figures which she used were based on renewal costs and that she rejected N & W's claimed need to rehabilitate the line above FRA Class I safety standards because N & W had failed to justify the reasonableness of rehabilitating the line to such a high level. *Wabash I* at 14, Joint Appendix at 25. The ALJ thus clearly based her calculation on a determination of maintenance which had been deferred but which would be required to be done if N & W were merely to maintain the line over a long period of time in its present condition. These were not the maintenance costs which would be required to rehabilitate the line and place it in a higher category of condition.

In its first decision, the ICC reiterated this distinction when it stated, "the judge was correct in her analysis of the costs necessary to *maintain* safe operations on this line." *Wabash II* at 3, Joint Appendix at 42 (emphasis added). The ICC did refer in its second opinion to the fact that the speed limit on the line had been reduced

from 40 m.p.h. to 10 m.p.h. and that this reflected deferred maintenance. *Wabash III*, 366 I.C.C. at 830. However, in its third and final opinion, the ICC clarified this issue by stating that the normalized maintenance figure used "was specifically equated with the annual cost necessary to maintain class I standards over the long term." *Wabash IV*, 366 I.C.C. at 902. Further, the basis of the ALJ's initial determination is so explicitly stated as relating to renewal rather than rehabilitation maintenance costs that the reference in the ICC's second opinion to a reduction in speed limit as indicating deferred maintenance does not seem to provide an adequate basis for determining that the ICC abused its discretion. On remand, therefore, it would appear to be proper for the ICC to continue to utilize normalized maintenance figures which reflect the expenditures which would be necessary to continue to operate the line safely at FRA Class I standards.

The shippers, particularly South Milford, argue that N & W has deliberately downgraded the line by refusing to include in its tariff schedule a 100-car unit rate for South Milford in shipping grain to export markets rather than only the three-car unit rate now available. South Milford claims that if a lower rate were available, it could generate up to $770,000 in additional revenues for the subject line by shipping 300 to 400 cars per year. *See Wabash III*, 366 I.C.C. at 838–39. The Commission, in its second opinion, stated that if South Milford's claim was based on the contention that the available rates were unreasonable, then South Milford should have challenged the existing rate under 49 U.S.C. § 10705. *Wabash III*, 366 I.C.C. at 838–39.

■ More significantly, however, the ICC has argued that South Milford's own witness estimated that, even if South Milford undertook to expand its plant, it could ship only 140 cars by 1986. *Wabash I* at 13, Joint Appendix at 24. At subsequent hearings, South Milford's witness testified that South Milford was unwilling to make

the necessary expenditures to expand its facility while N & W's abandonment application was pending. ICC Brief at 29. It therefore appears that the reason for South Milford's failure to ship additional grain lies ultimately in its fear of a possibility of abandonment. However, the cause of this apprehension—N & W's announced intent to seek permission to abandon—cannot itself be used as evidence of a specific intent on N & W's part to downgrade the line deliberately in order to reduce its profitability. *See International Minerals & Chemical Corp.*, 656 F.2d at 261 (carrier's failure to seek additional business on a line which the carrier thinks is highly unprofitable is not evidence of an ulterior motive to downgrade deliberately). As we stated in *Simmons v. United States*, 698 F.2d at 897, the filing of an abandonment application may discourage shippers, but this does not constitute sufficiently weighty evidence of intentional downgrading as to require the ICC to make a finding of improper downgrading.

Finally, petitioners also contend that the ICC's use in its second and third opinions of financial data for the year 1981 was improper because that year was economically depressed and so was not representative. Much of the bridge traffic handled on the line in question depends on the automobile industry, and in 1981 that traffic was significantly lower than in 1979, one of the years on which the ICC had relied in its first opinion. First, we note that this point is largely moot because we expect that on remand the ICC will use in its reconsideration even more recent financial data which would presumably reflect at least the beginning recovery of the automobile industry. In addition, however, we cannot say that the use of 1981 data was an abuse of discretion because the ICC is required under its regulations, 49 C.F.R. § 1152.31, to use the latest 12-month calendar year as the base year for its calculations and, in its second and third opinions, the relevant year was 1981. Further, as noted, the routing of bridge traffic is largely discretionary with the carrier, and so the effect which revenues from such traffic

have on the ICC's determination is minimal. This fact, together with the hypothesized recovery in the automobile industry, which was still largely speculative at the time of the ICC's second and third opinions, leads us to conclude that the ICC did not abuse its discretion in its use of 1981 base year data.

For the reasons stated above, we vacate the decision and certificate of abandonment issued by the ICC and remand to the ICC for reconsideration in accordance with this opinion.